HINERMAN, APPELLANT, *v.* BALDWIN ET AL., RESPONDENTS.

(No. 5,231.)

(Submitted May 21, 1923.   Decided June 4, 1923.)

[215 Pac. 1103.]

*Cancellation of Instruments — Oil and Gas Leases — Want of Consideration — Burden of Proof — "Royalty"—Fraud — Ignorance and Mistake—Evidence—Insufficiency—Contracts —Mutuality.*

Appeal and Error — Exhibits — Failure to Certify to Supreme Court Renders Reference Thereto in Record Conclusive.

1.   Where exhibits introduced at the trial were not certified to the supreme court or incorporated in the record, reference to them on the examination of witnesses and in the findings of the trial court must be accepted as conclusive on appeal.

Oil and Gas Lease—Consideration—Sufficiency.

2.   Where plaintiff received a check for fifty dollars in consideration of an oil and gas lease upon his land, his claim that there was a want of consideration was without merit, the fact that he at once indorsed the check and redelivered it to the lessee as his contribution under a pooling agreement with a number of other lessors, being a matter of his own concern not affecting the question of consideration.

Same—Want of Consideration—Burden of Proof.

3.   The burden of proving want of consideration sufficient to support a contract of lease in an action for its cancellation on that ground rests upon plaintiff.

Same—Cancellation—Fraud Based on Matter of Law—Insufficiency.

4.   Fraud generally cannot be successfully predicated on a matter of law, since parties are presumed to know the law; hence a representation made by one to a land owner in his endeavor to secure an oil and gas lease, that he already owned all the oil and gas on the land by reason of placer locations, amounting merely to an expression of the legal effect of the placer locations, was insufficient to support an allegation of fraud in that respect.

Same—"Royalty"—Ignorance and Mistake—Evidence—Insufficiency.

5.   Where plaintiff in an action for the cancellation of an oil and gas lease relied upon ignorance and mistake, contending that he did not understand the meaning of the word "royalty" and that the royalty fixed was insufficient, evidence showing that he was a man of schooling, aged thirty years, that he had fully discussed the terms of the lease, understood its contents, had conferred with an attorney and signed the lease without compulsion after considerable correspondence with the lessee concerning his oil rights, was in-

5.   Equitable relief against contract on account of mistake due to negligence, see notes in 5 **Ann. Cas.** 214; 11 **Ann. Cas.** 1164; **Ann. Cas.** 1913A, 432.

[67 Mont. 417.]

sufficient to support his allegation of ignorance and mistake, it having been his duty to know the meaning of the word "royalty" or to ascertain its meaning before signing the lease.

Same—Mutuality as to Each Covenant not Required.

6.  Generally it is not essential that each covenant of agreement of the lessor in an oil lease shall be supported by specific reciprocal covenant or agreement by the lessee, it being sufficient if the contract contain mutual obligations binding upon both parties, and where such a lease, supported by a consideration, contained a provision that the lessee could surrender it "upon payment of $——," it was not void for want of mutuality in this respect, the other provisions of the contracts being wholly independent of it and enforceable.

Same—Contract—Valid Though Burdensome and Unwise.

7.  Where no legal impediment is shown which would have prevented parties to a contract from entering into it or from expressing it in language of their own, courts must give effect to the meaning and intention of the parties as expressed in the language employed and may not make a new contract for them, the mere fact that as made the contract may appear unreasonable, burdensome or unwise to one of them being insufficient to avoid it, where the latter was of legal age, had all the facts clearly before him long prior to its execution and his alleged damage was due to his own inattention and carelessness.  ·

*Appeal from District Court, Carbon County, in the Thirteenth Judicial District; C. E. Comer, Judge of the Twentieth District, Presiding.*

Action by Verdean B. Hinerman against C. J. Baldwin and others. From a judgment for defendants, plaintiff appeals. Affirmed.

*Messrs. Johnston, Coleman & Johnston* and *Messrs. Nichols & Wilson,* for Appellant, submitted a brief; *Mr. J. H. Johnston* argued the cause orally.

If plaintiff was ignorant of the meaning of the word "royalty," and signed the lease because of an honest mistake as to the purport and effect of the language of the instrument, then he is entitled to rescind and cancel the contract, because, as a matter of law, there has been no meeting of the minds of the parties and there is no contract. The plaintiff believed he was getting one thing and the defendants knew he was getting another. Whether the mistake be treated as a mistake of law or a mistake of fact is immaterial. In either case the apparent consent of the parties is not real or free, and hence

one of the essential elements of a valid contract is wanting. (Secs. 4966 and 4973, Rev. Codes 1907; *St. Nicholas Church* v. *Kropp*, 135 Minn. 115, L. R. A. 1917D, 741, 160 N. W. 500; *Allen* v. *Luckett*, 94 Miss. 868, 136 Am. St. Rep. 605, 48 South. 186; *Ehrmann* v. *Stitzel*, 121 Ky. 751, 123 Am. St. Rep. 224, 90 S. W. 275; *Eldorado Co.* v. *Darnell*, 135 Iowa, 555, 124 Am. St. Rep. 309, 113 N. W. 344; *Sanford* v. *Gates*, 21 Mont. 277, 53 Pac. 749; *Palace Hdw. Co.* v. *Smith*, 134 Cal. 381, 66 Pac. 474; *Sherwood* v. *Walker*, 66 Mich. 568, 11 Am. St. Rep. 531, 33 N. W. 919; *Rackermann* v. *Riverbank Imp.*, 167 Mass. 1, 57 Am. St. Rep. 427; *Brown* v. *Lamphear*, 35 Vt. 252; *Keene* v. *Demelman*, 172 Mass. 17, 51 N. E. 188; *Dunan* v. *Providence R. Co.*, 5 R. I. 130; *Nelson* v. *Carlson*, 54 Minn. 90, 55 N. W. 821; *Crowe* v. *Lewin*, 95 N. Y. 423; *White* v. *Stevenson*, 144 Cal. 104, 77 Pac. 828.)

The lease in question contains the following provision: "Upon the payment of —— Dollars at any time by the Lessee to the Lessor the Lessee shall have the right to surrender this lease for cancellation, by redelivering the same to the Lessor or to the said bank —— his agent, therefor, and upon such surrender being made, all payments and liabilities thereafter to accrue by the terms of this lease shall be avoided and extinguished and this lease become null and void." This provision has been long common to oil and gas leases and has been the subject of much consideration by the courts. An examination of those cases in which it has been considered will disclose that the almost universal practice has been to insert the nominal consideration of one ($1) dollar. In the instant case no additional or special consideration being specified, the privilege of cancellation, at their option, is given the lessees as one of the many benefits to be received by them in return for the "1/27 interest in whatever royalty they can secure." This reduces the contract to a purely unilateral agreement which is void for want of mutuality.

Many, if not most, of the authorities hereinafter cited involve not only the question of want of mutuality but also the

question of want of consideration where the lease imposes upon the lessee no obligation to drill and develop the property. (Thornton on Law of Oil and Gas, 87; Morrison on Oil and Gas Rights, 74; *Ellis* v. *Dodge,* 237 Fed. 860; *National Oil & Pipe Line Co.* v. *Teel* (Tex. Civ.), 67 S. W. 545; *Long* v. *Sun Co.,* 132 La. 601, 61 South. 684; *Kleppner* v. *Lemon,* 176 Pa. St. 502, 35 Atl. 109; *Robb* v. *Railroad,* 82 Tex. 392, 18 S. W. 707; *Benavides* v. *Hunt,* 79 Tex. 383, 15 S. W. 396; *Marble Co.* v. *Ripley,* 10 Wall. (U. S.) 339, 19 L. Ed. 955 [see, also, Rose's U. S. Notes]; *Eclipse Oil Co.* v. *South Penn. Oil Co.,* 47 W. Va. 84, 34 S. E. 923; *Emery* v. *League* (Tex. Civ.), 72 S. W. 603; *Petroleum Co.* v. *Coal etc. Mfg. Co.,* 89 Tenn. 381, 18 S. W. 65; *S. R. Co.* v. *Frank etc.,* 55 S. C. 379, 33 S. E. 485; *Kelly* v. *Ohio Oil Co.,* 57 Ohio St. 317, 49 N. E. 399; *Berry* v. *Frisbie,* 120 Ky. 337, 86 S. W. 558; Costigan on Mining Law, 475; *Litz* v. *Goosling,* 93 Ky. 185, 19 S. W. 527; *G. W. Oil Co.* v. *Carpenter,* 43 Tex. Civ. 229, 95 S. W. 57; *Steinwender* v. *Guenther* (Ky.), 80 S. W. 1170; *Lowe* v. *Ayer* (Ky.), 97 S. W. 383.)

*Mr. Sterling M. Wood,* for Respondent, submitted a brief and argued the cause orally.

The record shows that Hinerman received the lease for signature at Ashton, Idaho, read it over very casually and then signed it. Defendant Breen was not present at the time, nor any of the lessees, and made no effort in person or through any representative to persuade Hinerman to sign. Had Hinerman consulted anybody of even average intelligence he could have readily determined the meaning of the word "royalty" so as not to have been misled. On the contrary, he did nothing but sign and return the lease. If this is "mistake" within the meaning of the law, then no person is ever safe in the making of a contract with another person. However, we submit that in the light of these admitted facts the appellant is not in a position to claim mistake. (*Grieve* v. *Grieve,* 15 Wyo. 358, 11 Ann. Cas. 1162, 9 L. R. A. (n. s.) 1211, 89 Pac.

569; *Vallentyne* v. *Immigration Land Co.* (Minn.), 5 Ann. Cas. 212; *Wilcox* v. *Schissler,* 55 Mont. 246, 175 Pac. 889.)

The law is well settled in many jurisdictions that a clause in an oil and gas lease of the character of the one here under consideration, which designates an amount to be paid as a condition precedent to the surrender of the lease, is not invalid for want of mutuality but that the consideration for the lease is deemed a sufficient consideration to support the surrender clause. (*Brown* v. *Fowler,* and *Brown* v. *Ohio Oil Co.,* 65 Ohio St. 507, 63 N. E. 76; *Bettman* v. *Shadle,* 22 Ind. App. 542, 53 N. E. 662; *Woodland Oil Co.* v. *Crawford,* 55 Ohio St. 161, 34 L. R. A. 62, 44 N. E. 1093; *Eclipse Oil Co.* v. *South Penn Oil Co.,* 47 W. Va. 84, 34 S. E. 293; *Henne* v. *South Penn Oil Co.,* 52 W. Va. 192, 43 S. E. 147; *Marshall* v. *Oil Co.,* 198 Pa. St. 83, 47 Atl. 927; *Ward* v. *Triple State etc. Co.,* 131 Ky. 711, 115 S. W. 819; *Roberts & Corley* v. *McFadden,* 32 Tex. Civ. App. 47, 74 S. W. 105; *Poe* v. *Ulrey,* 233 Ill. 56, 84 N. E. 46; *Housierre-Lattreille Oil Co.* v. *Jennings-Heywood Oil Syndicate,* 115 La. 107, 38 South. 932; *Brewster* v. *Lanyon Zinc Co.,* 140 Fed. 801, 72 C. C. A. 213; *Lowther Oil Co.* v. *Miller-Sibley Oil Co.,* 53 W. Va. 501, 44 S. E. 433; *Northwestern Oil & Gas Co.* v. *Branine* (Okl.), 3 A. L. R. 344, 175 Pac. 533.)

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action to cancel an oil and gas lease on plaintiff's lands, comprising 320 acres. It is predicated on want of consideration, fraud, want of mutuality and plaintiff's ignorance and mistake. Issue was joined by defendants' answer, denying the material allegations of plaintiff's complaint. A jury was expressly waived and the cause was tried to the court, which found in defendants' favor. Judgment was regularly entered, motion for a new trial denied, and the cause is now before us on appeal from the judgment. The errors specified raise only the question of the sufficiency of the evidence.

The defendants are the trustees of twenty-seven persons to an oil and gas pooling agreement, of whom the plaintiff is one. The lands claimed by the syndicate comprise 320 acres in addition to plaintiff's homestead, contiguous thereto.

It appears that several exhibits of importance to a correct [1] understanding of all the facts in this case were introduced at the trial, but they have not been certified to this court nor are they embodied in the record. We are therefore required to accept as conclusive such reference to them as was made on the examination of witnesses and by the trial court in its findings.

A copy of the lease sought to be annulled in this action is attached to the plaintiff's complaint as a part thereof. It was apparently executed on a printed form, with some additions thereto, and was duly acknowledged and recorded. So far as requisite for a proper understanding of the terms thereof as to questions arising thereunder, it reads:

"This agreement, made this 20th day of August, A. D. 1920, between Verdean B. Hinerman, of Ashton, Idaho, lessor, and C. J. Baldwin, C. E. Thompson and H. J. Breen, trustees, all of Bridger, Montana, lessees, witnesseth: That said lessor, in consideration of the sum of fifty dollars and other good and valuable considerations to him in hand paid by the lessee, the receipt of which is hereby acknowledged, and of the covenants hereinafter set forth to be kept, paid, and performed by the lessee, ha— leased and let, and by these presents do grant, lease, and let, unto the said lessees, their successors and assigns, all the oil and gas in and under the following described tract of land in the county of Carbon and state of Montana, to-wit: [Description.] To have and to hold the same for the term of two years from this date, and as much longer as oil and gas, or either of them, shall be produced from said land by the lessee, together with such rights of way and privileges on said land as may be reasonably necessary for the purpose of operating for, producing, and removing said oil and gas in a careful and economical manner. * * * If no well shall be

[67 Mont. 417.]

commenced on the land above described within two years from the date hereof, this lease shall become null and void, unless the lessee shall pay to the lessor for further delay a rental of 50 cents per acre in advance for each additional year until a well is commenced on said lands. All royalties, delay rentals, and other payments which may fall due under this lease shall be paid direct to lessor or be deposited to his credit in —— Bank of ——, which is hereby constituted agent of the lessor with power to receive and receipt for the same. Upon failure of the lessee to make any of the payments above provided for delay in commencing a well on the date upon which the same becomes due, the lessor shall have the right to declare a forfeiture of this lease if such payment be not made within ten (10) days after written notice to pay the same. Lessor shall be entitled to an undivided one twenty-seventh interest in whatever royalty the above-mentioned trustees, acting as such for themselves and others, can secure on the above-mentioned lands and other lands in the same district, which are comprised in what are known as the Reimer O. P. C., Argo O. P. C., Kakota O. P. C., and Rex O. P. C., and consisting of 640 acres. Lessor shall be entitled to 'share and share alike' with each one twenty-seventh interest involved in the above-mentioned 640 acres. * * * Upon the payment of —— dollars at any time by the lessee to the lessor, the lessee shall have the right to surrender this lease for cancellation, by redelivering the same to the lessor or to the said bank, * * * his agent, therefor, and upon such surrender being made, all payments and liabilities thereafter to accrue by the terms of this lease shall be avoided and extinguished and this lease become null and void."

The plaintiff was born in Roland county, Kansas, and at the time of the trial (November 15, 1921) was thirty-two years of age. He attended school when a boy, and went as far as the eleventh grade, equivalent to the third year of high school. In the year 1914 he entered the lands affected as a homestead, under the laws of the United States, which lands are located

about nine miles northeast of Bridger. On November 6, 1917, three or four months before he was in position to make final proof and obtain patent thereto, he entered the army. Before he entered the army, oil excitement in the vicinity of Bridger was just starting, and he then executed a lease covering the oil and gas within his homestead to the "Spindletop Oil Company." He was away in army service fourteen months, and after his return therefrom first met the defendant Breen in April, 1919. Breen went out to see the plaintiff on the Steelsmith farm, about two miles north of Bridger, where he was working for his brother. Breen was accompanied by Mr. and Mrs. Jack Hughes. Hughes was present at the conversation, and there had been no prior discussion about the matter. Breen wanted to obtain an oil and gas lease on the plaintiff's homestead, but the latter said he did not want to give it, as he had not received patent thereto from the government. Breen said the land had been located by himself and associates as placer mining claims; that they had drilled several test holes and thus had acquired possession and ownership to the oil and gas under the land; that they had no intention of cheating plaintiff out of what he was entitled to; and that the latter should execute a lease for his own protection. Prior to this conversation the plaintiff had been over the land, and knew of the holes there drilled, and saw casings sticking up.

The plaintiff testified concerning the conversation and agreement then had with Breen as follows: "When I met Mr. Breen, he did most of the talking. I have a fairly clear recollection of what he said. At that time he said to me that he wanted to form a company of twenty-seven, and that they had the oil and gas right on there, whether I signed the lease or not. He spoke about filing placer claims. I don't know as he told me what the names were. He did not tell me how many had been filed. He spoke something about the work that had been done to hold the claims. I don't know as he told me all, but he told me about the work that had been done on the place there through the placer claims. We were to put in $50 apiece to

form this company of twenty-seven, and then I told him I could not put in no $50, I did not have none to put in, and so then he had a check already written out, that he would put up the $50, for me to sign the check, and he would put up the $50, which I did. The purpose of that transaction, the $50 check that I mention, as they told me and as I believed, was that this company of twenty-seven was going ahead and do the drilling there on that place. I was under the impression that it was a company. I don't believe they ever mentioned the name of any company to me, or spoke of having incorporated anything. I would not say as to whether or not they said that there were twenty-six men interested in these placer claims, and that they wanted me to join them in the pool, so that the property could be worked. I am not clear about that. But I am perfectly clear in telling the court that Mr. Breen told me that they had the oil and gas rights under the land. That sticks in my recollection. When this transaction occurred, Mr. Breen filled out the check, and I signed it and gave it back to him. That is all I did; just signed it, and then he gave me the receipt which I have. * * * At the time of my conversation with Mr. Breen, I handed back to him this check that was introduced in evidence here a moment ago. I notice on the back of this check, 'Defendants' Exhibit 2,' the following statement: 'Payment in full of lease on 320 acres of homestead land in Bridger Canyon district for oil purposes and development as oil claims. V. B. Hinerman.' The 320 acres referred to in that memoranda were the 320 acres that I owned.''

No lease was then executed, but later there was a meeting at the bank in Bridger, about April 30, 1919, when some papers were signed by the plaintiff and others. As near as we can ascertain from the record, the paper then signed was a pooling agreement of some kind between the plaintiff and his twenty-six associates. After that (1919) the plaintiff moved away from Montana, and has been away practically all the time since. In the spring and early summer of 1920 the plaintiff was living at Ashton, Idaho, and while there had some cor-

respondence with Breen. Breen wrote a letter to plaintiff, referring to their agreement, and inclosed a deed of quitclaim of the oil and gas in plaintiff's land for execution by the plaintiff. Relative thereto the plaintiff testified: "The document marked 'Defendants' Exhibit 4' is a correct copy of the original letter which I received from Mr. Breen, addressed to me at Ashton, Idaho, and inclosing a certain deed. I did not sign it. * * * Mr. Breen also refers to an agreement of last spring on my half section. That was the agreement that we have just been talking about, that was represented by the indorsement on that check. I did not sign the quitclaim deed. That quitclaim deed is over at Ashton, Idaho. When I would not sign it, Mr. Breen wrote me and says I must have been to see some cheap attorney, because I would not sign it. That was another letter, after I would not sign it. Mr. Tom Hargin, an attorney who lives at Ashton, Idaho, replied to those letters [Defendants' Exhibit 4]. I just went up and asked him about this quitclaim deed, about signing it. [Defendants' Exhibit 4 admitted in evidence.] I would not say whether the attorney signed his name to the reply to this letter, or whether I signed it. I don't remember. If my attorney wrote the letter, I at least ratified and approved what he did. I recognize that as my signature. [Defendants' Exhibit 5 shown to witness.] That is my signature at the bottom, and this is the letter that my attorney wrote at that time. I approved of what was said in the letter. That was before I made the lease with Mr. Breen that is involved in this lawsuit. I knew nothing more then about oil terms generally than I did at the time of making the lease. I suppose I knew as much, but I had not been around the oil game at all. [Defendants' Exhibit 5 admitted in evidence. Defendants' Exhibit 6 shown to witness.] Defendants' Exhibit 6, which I have just read, is a copy of the letter that I received from Mr. Breen, dated May 8, 1920. I received it at Ashton, Idaho. I do not remember whether or not I answered that letter. At any event, I received it, read it, and knew the contents. [Defendants' Exhibit 6 ad-

mitted in evidence.] The next time I heard from Mr. Breen was when he wired me from Yellowstone. That is the west entrance to Yellowstone Park, seventy miles from Ashton. I replied to the letter that I could not come, and then Mr. Breen came to see me. * * * That lease had not been drawn at that time. It was just about then to be drawn. The conversation as I remember it was I wanted one-eighth royalty. Well, he said we could not do that, because it would force them all out, and so then I got to studying the matter over, and he informed me I would have a one twenty-seventh royalty of the oil and gas on this 640 acres, and then he told me what he would do, and he wanted the lease for two years, and I told him I would sign it for two years. I told him at that time that what I wanted was one-eighth royalty, and we finally compromised on one twenty-seventh of all oil and gas found on this 640 acres of land. Q. Didn't you know, Mr. Hinerman, that you were one of the twenty-seven in that pool, and that you were to get one twenty-seventh of what that pool got? A. That was my understanding, that I was to get a one twenty-seventh. * * * I knew that I was in this pool of twenty-seven, and I knew that I could get only one twenty-seventh of what they got. I expected to get one twenty-seventh of what they got. I expected to get one twenty-seventh of all the oil and gas, regardless of whether I signed that lease or not. Q. And at that time, Mr. Hinerman, although you did not know anything about the term 'royalty,' you nevertheless insisted upon having a one twenty-seventh royalty? A. That was some time after the lease transaction. Q. Oh, yes; but it was before this lease in suit was signed, wasn't it? A. Yes, sir. The rest of the conversation was that Mr. Breen and I agreed on this lease I am trying to get set aside, and he sent it over to the First National Bank at Ashton; sends me a letter asking me to go to the bank before a notary public and sign this lease, which I did. I have repeated practically all the conversation that I had with Mr. Breen that I remember, just outside of a little social talk there. I cannot repeat word

for word what Mr. Breen said that gave me the understanding that I was to have a one twenty-seventh interest. Mr. Breen sent these papers to the First National Bank by letter, and advised me that he was doing so. When I received this letter from Mr. Breen, I goes to the First National Bank to see if the leases were there, and Clarence Isenburg, the cashier, handed me the leases. I read them over and signed them, and Mr. Isenburg acknowledged it. I did not talk the matter over at that time with Mr. Isenburg. I spent probably a half hour looking these documents over and I read them thoroughly. I thought I knew everything they contained. I don't know as I knew everything. I was not sure. Then I went up to an attorney, and he was gone, and they didn't know when he would get back, so I trusted to Mr. Breen, and signed them and sent them back without any further effort to determine whether I understood them or not. That was in August, 1920. I did not have any more correspondence with Mr. Breen until Mr. Hopkins, attorney from Lewiston, came over there.    *    *    * He came over to Ashton and was telling me that I had nothing over there, if I let it go the way it was. He was representing the Atlantic Oil Company. As a result of Mr. Hopkins' persuasive tongue I then entered into a lease with the Atlantic Oil Company. That was about the eighteenth day of April, 1921, and that is about the time that I acquired my first understanding of the term 'royalty.' Mr. Hopkins made that very clear to me.    *    *    *

"By the Court: What do you understand now by the term 'royalty'? A. I understand by the term 'royalty' that I get one-eighth of the oil in that lease on my place, of the oil and gas.

"By the Court: This is under the lease made August 20, 1920? A. To the Atlantic Oil Company.

"By the Court: Under the Atlantic Oil Company lease would you have one-eighth royalty? A. Yes, sir. Q. You mean by that that you would get one-eighth net to you? A. Yes, sir.

[67 Mont. 417.]

"By the Court: Free of all expenses? A. Yes, sir.

"By the Court: As I understand you, that is what you thought the lease dated August 20, 1920, provided? A. No; one twenty-seventh. Mr. Breen's lease—

"By the Court: One twenty-seventh royalty? A. That is what I was understanding. Mr. Breen was telling me that I was to get one twenty-seventh of the oil and gas on the 640. * * * As a result of my talk with Mr. Hopkins, and his advice given to me at that time, and after I had made the lease to the Atlantic Oil Company [Defendants' Exhibit 7], this suit was brought. * * * I have seen Defendants' Exhibit 8 before, and recognize that as my signature. I placed that signature upon the document at Ashton, Idaho, and this is the acknowledgment by Mr. Isenburg that I referred to. The instrument came to me with the signatures of Baldwin, Thompson and Breen upon it. I read it through, and thought I read it carefully. If I read it through I also read this language at the bottom: 'Lessor shall be entitled to a one twenty-seventh interest in whatever royalty the above-mentioned trustees acting as such for themselves and others, can secure on the above-mentioned land.' Q. Now, will you please explain to the court what there is about that language that is uncertain, or that was difficult for you to understand? * * *

"By the Court: He may state what there was about it he did not understand. A. Well, I was going on Mr. Breen's talk more than anything. I read this language, and I ignored the language, and relied on what Mr. Breen said. I relied on him more than I did the lease. I didn't ask Mr. Breen to send the leases to the First National Bank at Ashton, Idaho, so that it could be attended to there. He asked me which bank I did business with, and I told him. I did not suggest anything. Mr. Breen wrote me a letter saying the leases had been sent to the bank. [Witness examines copy of letter.] That is a copy of the letter that I received [meaning Defendants' Exhibit 9]."

If such evidence establishes the allegations of plaintiff's complaint in any respect, we cannot see it. The burden of proof rested on the plaintiff, and since the testimony offered by the defendants did not better plaintiff's position in any manner, it is wholly unnecessary to here consider it. All of the trial court's findings are against the plaintiff.

The contention that there was no consideration for the [2, 3] execution of the lease is without merit. Being in writing, it imports a consideration. (Sec. 7512, Rev. Codes 1921.) Moreover, it specifically recites a consideration of $50, and receipt thereof is admitted. The written lease merely embodied the oral understanding had between Breen and the plaintiff in April, 1919, and that the money consideration was in fact paid to plaintiff is clear from his own testimony. True, he indorsed the check given him for that amount and redelivered it to defendant Breen; but this he had a perfect right to do. He agreed to enter the pooling agreement, and in furtherance thereof was required to pay $50, which he did with this check. What he actually did with the money by him received as consideration for the lease agreement was his own concern.

The burden of proof to show want of consideration sufficient to support the lease rested upon the plaintiff (sec. 7513, Rev. Codes 1921); but, as shown by his own statements, he has hopelessly failed.

As to alleged fraud and plaintiff's ignorance and mistake, [4] there is no proof sufficient to warrant an annulment of the contract. The plaintiff testified that the defendant Breen represented to plaintiff that he (the defendant Breen) and his associates, were the lawful owners and holders of all the oil and gas on his lands by reason of placer locations. This amounted merely to an expression of the legal effect of the placer locations, and the plaintiff cannot be heard to complain with respect thereto. Both parties were presumed to know the law, and fraud generally cannot be successfully predicated on a matter of law. (Sec. 7485, Rev. Codes 1921; 12 R. C. L. 295.) As to the facts, the plaintiff had theretofore executed

[67 Mont. 417.]

an oil and gas lease on his homestead. In 1917 he executed such a lease to the "Spindletop Oil Company." Moreover, he actually had the representations made by defendant Breen under consideration for one year and four months before the execution of the lease involved herein.

He had the advantage of schooling, and was over thirty [5] years of age. Execution of the lease was not forced upon him by anyone. He had ample time to fully satisfy himself as to his legal rights and the contents of the agreement. He read it over before signing it, and said he understood its contents. He had fully discussed the terms of the proposed lease with the defendant Breen on two occasions, widely separated in time, before signing it. He had refused to execute a quitclaim deed which had been sent to him, had conferred with an attorney and conducted considerable correspondence with Breen, assisted by his attorney, concerning his oil rights in the property, prior to actually signing the lease in question. The form of lease to be executed by him was mailed by the defendant Breen to the bank wherein the plaintiff did business at Ashton, Idaho, and the plaintiff there signed, acknowledged, and returned it by mail to Breen.

The proof wholly fails to sustain plaintiff's contention of ignorance respecting the word "royalty." He was given more time and opportunity to study Breen's proposition than is usually afforded in such cases. We conclude that he went into the transaction with complete understanding of his rights, and was entirely satisfied therewith until he learned of the possible value of the land and the possibility of making a better contract. Then he became dissatisfied with his bargain, and sought to set it aside upon the grounds alleged, none of which has he been able to sustain, viewing his case in light most favorable in all its aspects. He contends that he did not understand the word *"royalty,"* and that therefore he signed a lease whereby he is to receive an undivided one twenty-seventh interest in whatever *royalty* is received by the defendants from the land, whereas he is fairly entitled to a one-eighth

royalty. There is merit in his contention respecting the amount of royalty to which he is entitled, but that is not his contract. His alleged ignorance or mistake respecting the meaning of the word "royalty" is of no avail to him. The word has a very well understood and definite meaning in mining and oil operations. As thus used, it means a share of the produce or profit paid to the owner of the property (Webster's Dictionary.) He should have known its meaning, or in the exercise of ordinary care could and should have known, before signing the lease.

As to want of mutuality, it is urged that by the terms of [6] the lease, as executed, the lessee is permitted to surrender the lease and avoid liability "upon the payment of $ ——," which constitutes a unilateral contract and is therefore void; it being contended that the lease is a nullity, because it gives the lessees the right to cancel it without a corresponding right to the lessor. Generally, it is not essential that each covenant of agreement of the lessor shall be supported by specific reciprocal covenant or agreement by the lessee. It is sufficient if the contract contain mutual obligations binding upon both parties. A consideration having been paid for the lease, the surrender clause in favor of the lessees does not render the contract void for want of mutuality, even though incomplete as to the amount to be paid on surrender. Although such provision may be considered unilateral, consideration having passed for the execution of the contract, it is not rendered void because of want of mutuality in the surrender clause. (*Northwestern Oil & Gas Co.* v. *Branine* (Okl. Sup.), 3 A. L. R. 344, 175 Pac. 533; *Rich* v. *Doneghey* (Okl. Sup.), 3 A. L. R. 352, and exhaustive note at page 378, 177 Pac. 86.) In our opinion, however, since the amount to be paid on surrender of the lease was left blank, this provision became inoperative and of no more force or effect than if not contained therein. The lessor can exact nothing under this provision, for it requires nothing; and the lessees cannot avail themselves of its provisions, because no obligation is imposed upon them. It is

wholly independent of the other terms of the contract, and may properly be eliminated from consideration as comprising no enforceable part of the agreement. The other provisions of the lease stand without reference to or dependence upon it. However, as the plaintiff does not rely upon the violation of this provision of the lease by the defendants, its incompleteness is of no importance.

A contract must be so interpreted as to give effect to the [7] mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. (Sec. 7527, Rev. Codes 1921.) And the language of the contract is to govern its interpretation, if the language is clear and specific and does not involve an absurdity. (*Id.* 7529.) Contracts must receive such an interpretation as will make them operative and capable of being carried into effect, if this may be done without violating the clear intention of the parties. (*Id.* 7534.) Particular clauses of a contract are subordinate to its general intent. (*Id.* 7541.) Applying those fixed rules of interpretation of contracts, there is no avenue of escape from the lease open to the plaintiff.

There is no legal impediment shown which would prevent the parties from entering into any contract which they saw fit, nor from expressing it in language of their own, and under such circumstances it is the duty of the court to give effect to the meaning and intention of the parties as expressed in the language employed. The court has no right to make a contract for the parties different from that actually entered into by them. "Courts enforce contracts as made, unless good morals or public policy are contravened. They cannot create a new contract, nor can they permit the parties themselves to do so without the consent of all, upon any theory that the original contract was not the most beneficial or advantageous, or that the enterprise contemplated by its terms cannot be successfully operated under it." (6 Cal. Jur., sec. 192.)

The duty is imposed upon "parties entering into written contracts to see to it that the writing expresses the true agree-

ment; and they should not be heard in a court of equity to complain of injury resulting from their own inattention or neglect. The effect of a different rule would be to destroy in a large measure the value of written instruments as evidence, to encourage negligence, and to open the door for the substitution of parol for written evidence under the claim of mistake." (*Grieve* v. *Grieve,* 15 Wyo. 358, 11 Ann. Cas. 1162, 9 L. R. A. (n. s.) 1211, 89 Pac. 569.)

Whether the plaintiff made a good or a bad bargain is of no concern to the court. He was of legal age, and had all of the facts squarely and clearly before him long prior to the execution of the lease. Merely because the terms of the contract now appear unreasonable or burdensome affords no reason to permit him to avoid his contract. (*Frank* v. *Butte & Boulder Co.,* 48 Mont. 83, 135 Pac. 904; *Pearce* v. *Metropolitan Ins. Co.,* 57 Mont. 79, 186 Pac. 687; *State Bank of Darby* v. *Pew,* 59 Mont. 144, 195 Pac. 852; *Friesen* v. *Hart-Parr Co.,* 64 Mont. 373, 209 Pac. 986; *Emerson-Brantingham Imp. Co.* v. *Raugstad,* 65 Mont. 297, 211 Pac. 305; *General Fire Extinguisher Co.* v. *Northwestern Auto Supply Co.,* 65 Mont. 371, 211 Pac. 308; *McConnell* v. *Blackley,* 66 Mont. 510, 214 Pac. 64.)

When parties have reduced their contracts to writing, the writing is presumed to contain the final agreement arrived at between them and to express their real purpose and intent. The duty of the court is to enforce contracts, not to make new ones for the parties, however unwise the terms may appear. To permit the avoidance of written contracts upon such pretext would be to open the way to defeat the very purpose of contracts in writing.

"It is the general rule that a party will not be relieved, either by a court of equity or a court of law, from the consequences of his own inattention and carelessness. If it appears that he who claims to have been deceived to his prejudice has investigated for himself, or that the means were at his hand to ascertain the truth or falsity of the representations made

[67 Mont. 417.]

to him, he may not be granted relief on the ground that he has been misled to his prejudice.   *   *   *   In ordinary business transactions parties are expected and required to use reasonable care and prudence, and not rely upon those with whom they deal to care for and protect their interests." (*Wilcox v. Schissler*, 55 Mont. 246, 175 Pac. 889.)

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, HOLLOWAY and STARK concur.