T. P. STOKES, Plaintiff and Respondent, v. MARTIN TUT-
VET and ASLAUG BERG TUTVET, Husband and Wife,.
Defendants and Appellants.
No. 9594.
328 Pac. (2d) 1096.
Submitted on Rehearing June 6, 1958. Decided August 11, 1958..

Selden S. Frisbee, Cut Bank, for appellants.
Ernest J. McCabe, Jr., Great Falls, for respondent.

MR. JUSTICE CASTLES:

This is an appeal from a judgment in favor of plaintiff in an action for specific performance which arose over the interpretation of a contract for the conveyance of land. Upon trial before the court without a jury the court rendered its judgment in favor of plaintiff and against the defendants.

In the fall of 1947, the defendants listed their lands for sale with a real estate broker, one Fjosee. As a result of Fjosee's endeavors, a contract was entered into between the parties, the defendants as first party sellers and the plaintiff as second party buyer. The sellers and the buyer never personally met and discussed terms. The plaintiff and respondent, hereinafter referred to as the buyer, first talked to Fjosee a few days before he purchased the property. For all that appears in the record, the only discussion had between Fjosee and the buyer concerned the purchase price and terms of payment. Fjosee was the only intermediary between the parties themselves, and he was acting as the seller's agent. It was stipulated that the contract was drawn by an attorney employed by Fjosee, but that the attorney did not see or talk with either party. Whether or not the intention of the parties was expressed in any negotiations had does not appear because the trial court ruled out any evidence as to intent on the basis that the written contract was clear, certain and unambiguous and could not be explained by parol evidence.

By the contract the sellers agreed to sell to the buyer certain land described in the contract, and the contract contained the following exception and reservation:

"* * * excepting and reserving unto the said first parties all except two percent (2%) of the landowner's royalty rights in and to all oil, gas and other minerals in, under or upon said premises, said two per cent (2%) of said landowner's royalty rights to be deeded to the said second party."

The contract provided that the sellers were to convey "by a good and sufficient Warranty Deed"; and that was the only provision concerning the type of conveyance to be used by the sellers.

At the time the contract was entered into there was no lease for oil and gas exploration.

The buyer made all of his payments as the contract provided up to the final payment.

At the time the buyer tendered the final payment to the

sellers through the real estate broker Fjosee, he also tendered a deed to be executed by the sellers in which there was contained a reservation to the defendants of 10½ per cent of the landowner's royalty of the oil and gas, thus attempting to indicate that landowner's royalty was only 12½ percent. This deed was not returned to the buyer and was not produced at the trial.

The sellers executed and delivered to the buyer a warranty deed conveying the land described in said contract which warranty deed contained the following provisions as a reservation and exception:

"Saving and Excepting and Reserving unto the parties of the first part, their successors and assigns, all of the oil and gas and other minerals, in, under and that may be produced from said lands."

Along with the deed the sellers also executed and delivered a royalty assignment of 2 percent landowner's royalty of all of the oil and of all of the gas produced and saved from the lands described in the contract.

The buyer refused to accept these conveyances contending that they did not comply with or fulfill the terms of the contract.

Following several attempts to complete the transaction, the plaintiff buyer commenced this action. The complaint is one seeking specific performance. It set out the execution of the contract; the fulfillment of the terms thereof by the buyer and tender of the last payment due; the execution by the sellers of the deed with the reservation hereinbefore referred to delivery of which was refused by the buyer "for the reason that the description of the property to be conveyed is not in accordance with the terms of the contract"; and the offer of the sellers to convey to the buyer "two percent of the oil and gas and other minerals in and under and that may be produced from said lands" which was refused by the buyer for the reason that it was not in accordance with the terms of the written contract. The buyer then prayed for judgment re-

quiring the sellers to execute and deliver to the buyer a sufficient conveyance of the property "wherein said property be described as hereinbefore set forth, and together with all tenements, hereditaments, and appurtenances thereto belonging or in anywise appertaining, excepting and reserving unto the said first parties all except two percent (2%) of the landowner's royalty rights in and to all oil, gas and other minerals in, under or upon said premises."

The answer alleged that it was the intention of the sellers to convey only the surface of the property and a royalty interest of 2 percent of the oil, gas and other minerals to be produced and saved from said property, and that the sellers were to except from the conveyance and reserve to themselves all oil, gas and other minerals in, under and upon said premises; further alleged the execution of the deed and royalty assignment; and that by the tendered deed and royalty assignment the sellers had complied with the terms of the contract.

The answer then contained a cross-complaint in which all of the foregoing matters are set out and in addition alleges: that in view of the fact the litigation has arisen, the quoted exception and reservation provision of the contract is ambiguous and uncertain and that to execute the conveyances demanded by the buyer would only result in further confusion and litigation and would continue to render the title doubtful; and that in order to effect the intention of the parties to the contract the conveyances delivered by the sellers are proper and in accordance with the provisions of the agreement. The cross-complaint then asked for a declaratory judgment adjudicating the rights of the parties and declaring that the deed and royalty assignment therebefore tendered are in compliance with and in performance of the contract.

The trial court rendered its judgment whereby it ordered the sellers to execute and deliver to the buyer a good and sufficient warranty deed, in usual form, conveying to the buyer the lands in question with the following exception and reservation: "excepting and reserving unto the said defendants all

of the landowner's royalty rights in and to all oil, gas and other minerals in, under or upon said premises, Excepting two percent (2%) of such landowner's royalty right."

From this judgment and decree the sellers have appealed.

The specifications of error resolve themselves into a consideration of whether the reservation and exception contained in the contract is ambiguous and uncertain and whether evidence should have been received to ascertain the intention of the parties.

It is quite clear from the record in the trial court that the trial judge made his rulings on evidentiary matters on the basis that the terms of the contract were not ambiguous. He stated: "To me the terms of the contract are not at all ambiguous. They are in the ordinary language of reservations covering matters of that kind."

We can only observe that the case law in Montana on the subject leaves much to be desired, and that the terms of the reservation and exception in the aforementioned contract leave much to be desired in the language used. The wording is susceptible to several interpretations and we think reasonably so. The trial court was thrown into error by his belief that the terms of the contract were not at all ambiguous.

Certain basic, well-established rules with relation to the field of oil and gas conveyancing should be stated before we enter into a discussion of how this case should be decided.

*First,* Montana is an ownership-in-place state with regard to oil, gas and other minerals. "The general rule is that —'Both petroleum and gas, as long as they remain in the ground, are a part of the realty. They belong to the owner of the land, and are a part of it as long as they are on it or in it, or subject to his control. When they escape and go into other lands, or come under another's control, the title of the former owner is gone, and when produced on the surface they become personal property and belong to the owner of the well.' (18 R.C.L. 1205; Lanyon Zinc Co. v. Freeman, 68 Kan. 691, 75 Pac. 995, 1 Ann. Cas. 403.)" Gas Products Co. v. Ran-

kin, 63 Mont. 372, 393, 207 Pac. 993, 998, 24 A.L.R. 294; followed in Homestake Exploration Corp. v. Schoregge, 81 Mont. 604, 264 Pac. 388.

*Second,* Montana recognizes the rule that the title to the ██ mineral interest in land, including oil and gas interests, may be segregated in whole or in part from the rest of the fee simple title. Rist v. Toole County, 117 Mont. 426, 159 Pac. (2d) 340, 342, 162 A.L.R. 406; Krutzfeld v. Stevenson, 86 Mont. 463, 284 Pac. 553; Broderick v. Stevenson Consol. Oil Co., 88 Mont. 34, 290 Pac. 244.

*Third,* Under a mineral deed conveyance, that is a convey-██ ance of the mineral fee, the grantee is the recipient of the following incidents: "1. The right to go upon the land, conduct exploratory operations, and produce oil and gas. If there is a subsisting oil and gas lease, this right is subject thereto, but may be exercised if and when the lease terminates;

"2. The right to execute an oil and gas lease. If there is a subsisting lease this right is also subject thereto;

"3. The right to a share in the bonus under future leases;

"4. The right to a share in the rentals under existing and future leases;

"5. The right to share in the royalties under existing and future leases." Sullivan, Handbook of Oil and Gas Law, p. 208. See also 3A Summers' Oil and Gas, section 599 at page 241 (perm. ed. 1958); Krutzfeld v. Stevenson, supra; Duvall v. Stone, 54 N. M. 27, 213 Pac. (2d) 212, 215, 216.

Since all of the above rights may be transferred separately, it is difficult in many instances to distinguish a true mineral fee deed, grant or reservation from other types of oil and gas conveyances. See Sullivan, Handbook of Oil and Gas Law, p. 207; 3A Summers' Oil and Gas, section 599, page 236; Annotation 4 A.L.R. (2d) 492.

Whether a royalty or mineral interest has been granted depends in each case on the incidents of the interest conveyed. This in turn necessitates analyzing a "royalty" as distinguished from a "mineral" interest.

This court has consistently adhered to the view that the word "royalty" standing alone has a " 'very well understood and definite meaning in mining and oil operations. As thus used, it means a share of the produce or profit paid to the owner of the property. Webster's Dictionary.' The expression 'a share of the produce of profit paid to the *owner* of the property' is quite different from a share or interest in the property itself. It recognizes that the originator of the royalty is still the owner of the real property to which it relates, and that the assignee's interest is only in the 'produce or profit' therefrom,—namely, in the personal property which the owner is to receive for the granted privilege of producing minerals from his land." Rist v. Toole County, supra, 117 Mont. at page 432, 159 Pac. (2d) at page 342.

"*Royalty* is a share in production. As applied to an oil and gas lease, it means the share of the oil which is received by the lessor from production under the lease in return for permission to use the property by withdrawing the oil therefrom. *In its broadest sense, however, it refers to an interest that the landowner may create by outright grant or reservation either before or after the execution of an oil and gas lease.* When used in this sense the ownership of royalty gives no rights to enter upon the land for any purpose or to interefere with the landowner in any way." Emphasis supplied. Sullivan, Handbook of Oil and Gas Law, page 218; see also Watkins v. Slaughter, 144 Tex. 179, 189 S.W. (2d) 699; Palmer v. Crews, 203 Miss. 806, 35 So. (2d) 430, 4. A.L.R. (2d) 483; Moore v. City of Beaumont, Tex. Civ. App. 1946, 195 S.W. (2d) 968, affirmed 146 Tex. 46, 202 S.W. (2d) 448; Pease v. Dolezal, 206 Okl. 696, 246 Pac. (2d) 757; Duvall v. Stone, supra; Schlittler v. Smith, 128 Tex. 628, 101 S.W. (2d) 543.

Courts have recognized that a landowner may grant or reserve a royalty of interest in advance of the execution of an oil and gas lease. Rist v. Toole County, supra; Clampitt v. Ponder, D.C., 91 F. Supp. 535; 3A Summers' Oil and Gas sections 572, 599.

. Such a grant or reservation entitles the holder to a share of production, if, and when production of oil and gas is obtained. Pease v. Dolezal, supra; Sullivan, Assignments by the Landowner and the Lessee, 17 Mont. L. Rev. 64, 65. It includes none of the usual attributes of ownership, such as the right to possess, lease or otherwise control the minerals. 4 A.L.R. (2d) 497, 498,. 499; Sullivan, Handbook of Oil and Gas Law, supra.

Where the grant or reservation of the royalty interest is ▆ made before the execution of an oil or gas lease, and is not otherwise limited as to time the interest created is referred to as a perpetual nonparticipating royalty. Clampitt v. Ponder, 91 F. Supp. 535, supra; Hanson v. Ware, 224 Ark. 430, 274 S.W. (2d) 359, 46 A.L.R. (2d) 1262; Miller v. Speed, Tex. Civ. App. 1952, 259 S.D. (2d) 235; Watkins v. Slaughter, supra; Denver Joint Stock Land Bank v. Dixon, 57 Wyo. 523, 122 Pac. (2d) 842, 140 A.L.R. 1270; Calcote v. Texas Pacific Coal and Oil Co., 5 Cir., 157 F. (2d) 216, 167 A.L.R. 413, certiorari denied 329 U.S. 782, 67 S. Ct. 205, 91 L. Ed. 671, rehearing denied 329 U.S. 830, 67 S. Ct. 356, 91 L. Ed. 704.

"Non-participating royalty has a well-understood meaning in the oil industry. It may be defined as an interest in the gross production of oil, gas and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the bonus payable for, or the delay rentals to accrue under, oil, gas and mineral leases executed by the owner of the mineral fee estate. The exclusive-leasing privilege remaining in the mineral fee owner is commonly referred to and known as the 'executive right'." Jones, Non-Participating Royalty, 26 Texas L. Rev. 569. See also 3A Summers' Oil and Gas, section 599 at page 276.

It has been consistently held that non-participating royalty gives the holder thereof no right to enter into any lease, or share in the delay rentals, bonuses or other incidents of a fee mineral ownership. 3A Summers' Oil and Gas, section 599, at

page 241; Sullivan, Handbook of Oil and Gas Law, supra; Clampitt v. Ponder, supra; Denver Joint Stock Land Bank v. Dixon, supra.

The distinction between a mineral fee interest and a nonparticipating royalty was well defined by Professor Summers in his work on Oil and Gas. See Vol. 3A, section 599, page 241.

Since "royalty" and "nonparticipating royalty" are shares in production only, certain words denoting a share in production have been used to delimit the interest conveyed. Likewise a mineral interest being a severing of the mineral fee is often described in terms of ownership under the ground. Thus, "produced and saved" have been associated with royalties, "oil and gas in and under and upon" the land, have been associated with a mineral interest. See Marias River Syndicate v. Big West Oil Company, 98 Mont. 254, 38 Pac. (2d) 599; Rist v. Toole County, supra, 117 Mont. 426, 159 Pac. (2d) 340; Mitchell v. Hannah, 123 Mont. 152, 208 Pac. (2d) 812; Krutzfeld v. Stevenson, supra, 86 Mont. 463, 284 Pac. 553; Broderick v. Stevenson, supra, 88 Mont. 34, 290 Pac. 244; Maxwell, The Mineral—Royalty Distinction and the Expense of Production, 33 Texas L. Rev. 463, 471.

There are some jurisdictions, which have construed the word "royalty" when found in an instrument, much more strictly than others, giving it its "well-defined" meaning as iterated by this court in Hinerman v. Baldwin, 67 Mont. 417, 215 Pac. 1103, even though it appears with words denoting mineral ownership. See, e. g., Schlittler v. Smith, 101 S.W. (2d) 543, supra; Watkins v. Slaughter, supra, 144 Tex. 179, 189 S.W. (2d) 699; Pure Oil Co. v. Kindall, 116 Ohio St. 188, 156 N.E. 119; Arkansas Valley Royalty Co. v. Arkansas-Oklahoma Gas Co., 222 Ark. 213, 258 S.W. (2d) 51. Oklahoma adheres to the rule that the use of the word "royalty" without more, in a conveyance before a lease on the premises is executed generally denotes mineral rights; where there is a lease it denotes only an interest in the production. Elliott v. Berry, 206 Okl. 594, 245 Pac. (2d) 726.

The problem of course becomes most acute when words denoting a royalty interest are used in combination with those denoting a mineral interest. See, e. g., Marias River Syndicate v. Big West Oil Co., supra; Krutzfeld v. Stevenson, supra.

In the Marias River case, the following reservation was construed to reserve 12½ percent of the minerals in place [98 Mont. 254, 38 Pac. (2d) 600] : "Reserving * * * a 12½ percent interest and royalty in and to all oil and gas and other minerals of whatsoever nature, found in or located upon or under said land or premises above described, or that may be produced therefrom." Justice Anderson in the majority opinion stressed two features surrounding the execution of the reservation as denoting a mineral ownership was intended: (1) The fact that no oil and gas lease had been executed prior to the reservation; and (2) The fact that the reservation used the words "found in or located * * * under said land."

The Marias River case has been frequently criticized for three reasons: (1) That this court failed to give proper emphasis to the fact the word "royalty" had been used in the reservation; (2) that it had not given sufficient prominence to the words "or * * * produced therefrom," denoting a share in production rather than a share in the minerals; and (3) the fact this court failed to recognize that a landowner could convey or reserve a "perpetual non-participating royalty" as previously defined in this opinion, prior to leasing of the land for oil and gas purposes. See the critique in Shepherd, Oil and Gas Leasehold and Other Estates, 15 Mont. L. Rev. 1, 13; 3A Summers' Oil and Gas, section 599.

It should be noted also that the Marias decision cited two cases for its thesis that a mineral interest was reserved: Prairie Oil & Gas Co. v. Allen, 8 Cir., 1924, 2 F. (2d) 566, 40 A.L.R. 1389; and Smith v. Schlittler, Tex. City App. 1933, 66 S.W. (2d) 353. The Prairie Oil & Gas Co. case clearly reserved minerals. The Smith case was subsequently overruled. See 128 Tex. 628, 101 S.W. (2d) 543.

Since the Marias River case was decided, however, this

court has continually adhered to the decision rendered therein. However, we have forsaken our view that absence of an oil and gas lease on land prior to execution of a reservation has any particular importance in determining the interest reserved. See for example Rist v. Toole County, supra. Since the Marias River case this court has, however, emphasized the *absence* or presence of the words "in, under or upon" and the presence of the words "produced and saved." Thus, in Mitchell v. Hannah, supra, 123 Mont. 152, 156, 208 Pac. (2d) 812, 814, this court said:

"In the Rist case, discussing the holding in the Marias River Syndicate case, supra, relied on by plaintiff, this court said: 'In the Marias River Syndicate case the owner conveyed the lands with reservation of a fractional *"interest* and royalty in and to all oil and gas and other minerals of whatsoever nature, *found in or located upon or under* said land or premises above described, or that may be produced therefrom." The final phrase, "or that may be produced therefrom," is the only part of the reservation referring to production or severance of minerals'. The court there held, and rightly so, that such a reservation created a separate interest in the oil and gas and the owners of the respective interests became tenants in common.

"Here, however, we have a differently worded reservation, which expresses a different purpose and intent, 'excepting and reserving to the grantor all of the right, title and interest in and to 1% royalty of all the oil and gas *produced* and *saved"* from the described forty-acre tract 'conveyed to the grantor by W. B. Slagle under date of July 5, 1939'. (Emphasis supplied).

"This reservation defines the word 'royalty,' as all of the *oil and gas produced and saved from the described lands,* referring to the royalty 'conveyed to grantor by W. B. Slagle under date of July 5, 1939,' so that there can be no doubt as to the intention of the parties. It was the clear intent of the parties to reserve a royalty interest, and that interest was the interest

conveyed to said grantor by Slagle on July 5, 1939. There are no words in this exception or reservation that indicate any other intention. There are no words used to indicate a reservation of the oil and gas in and under or upon the said lands, as in the Marias River Snydicate, nor any indication that the grantor was reserving any minerals in place.'' See also In re Hume's Estate, 128 Mont. 223, 228, 272 Pac. (2d) 999.

While the Marias River case was criticized when first promulgated, twenty-four years have passed since its rendition. We may rightfully assume that many land contracts have been executed with the thought in mind of conforming the provisions of a mineral grant to those in the Marias case. Perhaps, when the Marias River case was decided, it might have been a better result to have strictly construed the word ''royalty,'' rather than giving more importance to the fact that the words ''in, under and upon'' were used, together with the absence of any lease on the land. This court, however, has repeatedly and consistently given strict interpretation to the qualifying words with which the word ''royalty'' appears. Although Montana has consistently stated rather pontifically, that the word "royalty" has a strict meaning, nevertheless we have just as consistently ignored the word when it is used in conjunction with others, and looked to its associates to construe its meaning. So long as Montana adheres to this principle we do not feel impelled to give the word ''royalty'' any more strict construction than it has been given in the past. The mere fact ''landowner's royalty'' appears in this instrument would normally be given no more emphasis than it has in the past, for we would be impelled, by *stare decisis* to follow the Marias River case.

Setting out the reservations in the instant case with those of the Marias case immediately underneath will indicate the reason we feel the Marias River case is controlling.

''* * * excepting and reserving unto the said first parties all except two percent (2%) of the landowner's royalty rights in and to all oil, gas and other minerals in, under or

upon said premises, said two per cent (2%) of said landowner's royalty rights to be deeded to the said second party.''

Marias River: ''Reserving unto the said parties of the first part a 12½ percent interest and royalty in and to all oil and gas and other minerals of whatsoever nature, found in or located upon or under said land * * * or that may be produced therefrom.''

Construing the reservation in the instant case along the reasoning of the Marias River case we would arrive at a result which would give the sellers 98 percent of all the minerals with their concomitant incidents, and give the buyer 2 percent of the minerals with their concomitant incidents.

One factor in this case however bars us from any such conclusion. Here the sellers state that this was never the intent of the party. This admission should be given a great deal of consideration since the construction agitated for by sellers (that is a reservation of all of the minerals to them with a grant of 2 percent landowner's royalty to the buyer) is derogatory of the interest they would have received under a strict Marias River construction. Under the Marias case only 2 percent of the minerals would be conveyed to the buyer with a proportionate share of the landowner's royalty under any future lease. For example, if a lease were executed on the land and the lessor received 12½ percent of the gross production, the buyer would receive only 2 percent of the 12½ percent or ¼ of 1 percent of gross production; whereas, under the construction stressed by the sellers he would receive a full 2 percent of the gross production.

We hold then that the hereinbefore quoted exception and reservation is ambiguous and uncertain. Thus, it became necessary for the trial court to determine what was the intention of the parties.

As previously related, the defendants pleaded in their cross complaint that the contract was ambiguous and uncertain and prayed for a declaratory judgment to adjudicate the rights of the parties. It was incumbent upon the trial court to endeavor

to determine the intent of the parties, if possible; and the exclusion of parol evidence of intent was error. R.C.M. 1947, sections 93-401-13, 93-401-17, 13-715; Brown v. Homestake Exploration Co., 98 Mont. 305, 39 Pac. (2d) 168; Sutton v. Masterson, 86 Mont. 530, 534, 284 Pac. 264.

Since this case is being remanded to the district court for a ▮▮▮▮▮ new trial there is one more issue which should be discussed. The plaintiff introduced witnesses who testified to the meaning of ''the customary landowner's royalty reservation in the oil and gas lease.'' Defendant strenuously objected to this line of testimony on the grounds it was ''incompetent, irrelevant and immaterial.''

The objection was good and should have been sustained. As previously stressed in the foregoing part of this opinion, there was *no* existing lease on the property; therefore, any reference to what ''landowner's royalty'' meant under a lease was wholly immaterial and irrelevant to the case at bar. While conceding, arguendo only, that the *usual* royalty obtained under the usual oil and gas lease is 12½ percent, nevertheless, we take judicial knowledge of the fact that the royalty obtained under a lease depends upon the bargaining position of the lessor.

Furthermore, under either the sellers' or buyer's arguments in this cause the most that the buyer was entitled to in the way of royalty was 2 percent of the gross production, free of cost. Assuming, arguendo, that custom or usage was permissible in this case to define ''landowner's royalty,'' the definition should have been confined to a definition of that term as used *prior* to leasing. As noted above, when ''royalty'' is conveyed prior to leasing (unless otherwise stipulated) a perpetual non-participating royalty is granted.

For the reasons stated, the judgment is reversed and the cause remanded for a new trial.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICE ANGSTMAN, concur.

MR. JUSTICES BOTTOMLY and ADAIR (specially concurring).

We agree with the result reached in the majority opinion but not with all that is said therein.