No. 93-426

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

CARBON COUNTY, a political subdivision
of the State of Montana,
            Plaintiff and Respondent

    -v-

UNION RESERVE COAL CO., INC., a Montana
corporation; RED-LODGE BEAR CREEK COAL
PARTNERS, a limited partnership; and
NORBERT H. KMOCH; et al.,
            Defendants and Appellants,

    -v-

FLORENTINE EXPLORATION & PRODUCTION, INC.,
a Montana corporation,
            Intervenor, Respondent/Cross-Appellant.

FILED

JUN 27 1995

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Thirteenth Judicial District,
               In and for the County of Carbon,
               The Honorable Robert W. Holmstrom, Judge presiding.


COUNSEL OF RECORD:

        For Appellants:

        Robert L. Stephens, Jr., Billings, Montana

        For Respondents:

        Anthony W. Kendall, Red Lodge, Montana; Hon.
        Joseph Mazurek, Attorney General, Clay Smith,
        Assistant Attorney General, Helena, Montana; James
        P. Healow, Sweeney & Healow, Billings, Montana
        (Florentine)

        For Amicus Department of State Lands:
        Tommy H. Butler, Special Assistant Attorney
        General, Helena, Montana

                            Heard and Submitted:  May 16, 1995

                            Decided:  June 27, 1995

Filed:

_____
                    Clerk

Justice James C. Nelson delivered the Opinion of the Court.

The plaintiff, Carbon County, initiated this suit to quiet title in all of the mineral and mineral rights, excluding the coal and coal rights, on certain lands within the county. Florentine Exploration & Production (Florentine) was allowed to intervene in the action, aligning itself with Carbon County. Following a bench trial, the District Court for the Thirteenth Judicial District, Carbon County, entered judgment for defendant, Union Reserve Coal Co. (Union Reserve), awarding Union Reserve nominal damages of $1.00. From that judgment, the defendant appeals and plaintiff and intervenor cross-appeal. We reverse and remand.

The issues on appeal, as framed by this Court, are:

1. Is coal seam methane gas a constituent part of the coal estate?

2. Did the District Court err in determining that Union Reserve has the right to produce coal seam methane gas from the coal lands?

3. Do the 1993 legislative amendments to § 15-1-101, MCA and § 82-11-101, MCA, and the enactment of § 82-1-111, MCA, constitute an unlawful taking of coal seam methane gas from the owners of coal or coal lands?

4. Did the District Court err in not granting punitive damages to Union Reserve?

FACTUAL BACKGROUND

Prior to October 10, 1974, Carbon County became the owner, through tax deed proceedings, of the entire mineral estate

2

underlying the disputed property. On November 1, 1984, Carbon County executed and delivered to Red Lodge-Bear Creek Coal Partners, Union Reserve's predecessor in interest, a deed which conveyed "[a]ll coal and coal rights with the right of ingress and egress to mine and remove the same from the following described acreage . . . ."

The deed did not make any reference to gas in general, coal seam methane gas, nor any mineral or hydrocarbon other than coal. The deed reserved a royalty of $.10 "per ton of 2,000 pounds of coal produced and saved from said lands." The deed made no reference to any royalty on gas that might be produced and saved, nor any other mineral which might be extracted from the property.

On August 21, 1990, Carbon County executed and delivered to Florentine an oil and gas lease whereby Florentine received the right to operate for and produce from the disputed property "oil and all gas including coal seam methane of whatsoever nature or kind . . . ." The lease was a standard Producer's 88 lease form, which provided for a royalty of 1/8 of the proceeds from any gas produced from the property. After obtaining the lease from Carbon County, Florentine solicited a protective lease from Union Reserve, but Union Reserve refused to provide such a lease.

On December 7, 1990, Carbon County filed a quiet title action against Union Reserve and various other named defendants, asserting Carbon County's claims to all of the mineral and mineral rights, excluding the coal and coal rights, on the disputed property. Florentine moved to intervene, asserting that it owned the oil and

3

gas lease and that Union Reserve had no estate, right or claim in the oil and gas including the coal seam methane gas. (At the time of the lawsuit, Florentine had drilled three wells, one of which was in the coal owned by Union Reserve.) Florentine sought injunctive relief and quiet title to the coal seam methane gas.

In its answer, Union Reserve asserted that it was entitled to a judgment declaring that its ownership of the coal and coal rights included the right to extract the coal seam methane gas. In addition, Union Reserve sought a judgment canceling Florentine's oil and gas lease and monetary damages for Florentine's trespass on Union Reserve's property.

Following a July 23, 1992, bench trial, the District Court entered Findings of Fact and Conclusions of Law which found that the coal seam methane gas was part of the coal estate and was included in the conveyance of coal and coal rights by Carbon County to Union Reserve's predecessor-in-interest. The court further held that Florentine did not acquire by its lease a right to drill and produce coal seam methane gas and that a trespass occurred which resulted in nominal damages of $1.00. The court ordered Florentine to remove its casing from the completed gas well sited on the disputed property.

On April 20, 1993, the District Court entered a Final Judgment and Decree consistent with its Findings of Fact and Conclusions of Law. Union Reserve appealed the District Court's judgment on the issue of punitive damages. Florentine appealed as to the ownership of the coal seam methane gas.

4

Subsequent to the District Court's judgment in this case, Senate Bill 294 was introduced to the 53rd Legislature of the State of Montana proposing changes in the statutory definitions of coal, oil and gas. Sections 15-1-101, MCA, and 82-11-101, MCA, were amended and a new provision, § 82-1-111, MCA, was added. These amendments will be discussed later in this opinion.

DISCUSSION

An explanation of the nature of coal seam methane gas and how it is produced and extracted is necessary in understanding the issues presented in this case. This discussion is derived from the following sources: Jeff L. Lewin et al., Unlocking the Fire: A Proposal for Judicial or Legislative Determination of the Ownership of Coalbed Methane, 94 W. Va. L. Rev. 563 (Spring 1992); Jeff L. Lewin, Coalbed Methane: Recent Court Decisions Leave Ownership "Up in the Air," But New Federal and State Legislation Should Facilitate Production, 96 W. Va. L. Rev. 631 (Spring 1994); and NCNB Texas Nat. Bank, N.A. v. West (Ala. 1993), 631 So.2d 212.

Coal seam methane gas, also called "coalbed gas" or "coalbed methane," is formed as a by-product of the "coalification" process. Carbon dioxide and water are incorporated into plants to form various hydrocarbon-based compounds which in turn decay to form peat. When peat is buried under other sediments, the pressure and temperature eventually convert it to coal, methane, and other gaseous byproducts.

Although it is not a chemical part of coal, coal seam methane gas has a weak physical attraction to coal. It can exist freely in

5

the cracks or fractures within the coal seam, but pressure causes most of the gas to be adsorbed within the coal, adhering to the internal surface of micropores in the structure of the coal. Hence, the coal acts as a container for the gas. When the pressure on the surrounding coal is reduced, the gas is released.

Highly combustible and poisonous, coal seam methane gas must be ventilated from coal mines to protect miners from disastrous explosions or inhalation. Originally thought of as only a waste product of the mining process, technological developments in the 1980s and changes in federal law made the gas a commercially viable alternative energy source.

Extraction of coal seam methane gas from coal seams and surrounding strata is generally accomplished by one of three methods: vertical degasification wells, horizontal boreholes or gob wells. Vertical degasification wells are drilled from the surface directly into an unmined coal seam to extract the gas that is trapped or collected there. The release of coal seam methane gas from the coal seam into the well may be increased by various methods of "fracturing" the coal seam near the bottom of the well. Hydrofracturing is the forcing of fluids under pressure into the well so as to cause a fracturing of the coal seam. This process creates fractures in the coal which serve as conduits through which gas can flow to the well's shaft.

A horizontal borehole is a hole bored into the coal seam from a point within the coal mine itself. The coal seam releases some of its adsorbed or trapped gas into the borehole where the gas is

6

then captured and extracted.

Finally, a gob well is a well drilled from the surface to an area near the coal seam. During the longwall mining method, a machine grinds into the wall of the coal seam tearing away the coal. As the machine grinds further and further into the wall, it leaves behind it a void into which the ceiling of the mine collapses creating a "gob" of rubble. Large quantities of coal seam methane gas collect in this area. The collapse of the ceiling of the mine also leaves the overlying strata unsupported, and gravity causes it to subside and to fracture as well, releasing more gas. Gas from the gob may travel upward into non-coal strata, where it may be collected and extracted through the gob well.

While the ownership of, and right to develop, coal seam methane gas are questions of first impression in Montana, courts in other jurisdictions have struggled with this issue for more than a decade. A brief examination of some of these cases is appropriate in resolving the issues presented in the case before us on appeal.

In 1983, the Pennsylvania Supreme Court was confronted with determining the ownership of coal seam methane gas in United States Steel Corp. v. Hoge (1983), 468 A.2d 1380. In Hoge, a 1920 severance deed conveyed to United States Steel Corporation's predecessors in title "all of the coal" contained in tracts of land owned by Hoge's predecessors in title. The deed conveyed the coal "[t]ogether with all the rights and privileges necessary and useful in the mining and removing of said coal, including . . . the right of ventilation . . . ." Hoge's predecessors retained the "right to

7

drill and operate through said coal for oil and gas without being held liable for any damages."

The Pennsylvania Supreme Court quieted title to the coal seam methane gas in United States Steel Corporation, the owner of the coal. The court concluded that any gas present in the coal "must necessarily belong to the owner of the coal, so long as it remains within his property and subject to his exclusive dominion and control." Hoge, 468 A.2d at 1383. (Emphasis omitted.) The court determined that Hoge owned only the coal bed gas that migrated into his property surrounding the coal.

The court in Hoge did not attempt to determine the intent of the parties by looking to the plain meaning of the grant. Instead, the court considered the characteristics, origins and history of coal seam methane gas. While this analysis may be appropriate in Pennsylvania, in Montana, when construing a phrase within a contract, "the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA.

In Hoge, the reservation of the right to drill for oil and gas is clear. However, the court went beyond the plain meaning of the reservation and determined that the parties could not have intended to reserve what was considered, at the time of the conveyance, merely a waste product. While coal seam methane gas was considered a waste product in 1920, its value was certainly established by 1984, the time of the conveyance to Union Reserve. Thus the rationale of Hoge is distinguishable from the case before us on appeal.

8

Moreover, while a reservation of the right to drill for oil and gas is not found in the deed to Union Reserve, the express grant of one specific mineral does not imply the grant of all other minerals not referred to in the grant. The maxim expressio unius est exclusio alterius (the expression of one thing is the exclusion of another) is routinely cited in Montana case law. See Matter of Estate of Donovan (1976), 169 Mont. 278, 282, 546 P.2d 512, 514; Teters v. Montana Eastern Pipe Line Co. (1945), 117 Mont. 477, 482, 159 P.2d 515, 517; Berne v. Stevens (1923), 67 Mont. 254, 258, 215 P. 803, 804. Furthermore, this principle has been directly applied to mineral law in Smoot v. Consolidated Coal Co. (1904), 114 Ill. App. 512, 517.

Additionally, in deciding Hoge, the Pennsylvania Supreme Court considered the characteristics of coal seam methane gas *in situ*, but Montana law currently and historically has provided that the determination of whether or not a substance is considered gas is made "at the wellhead." See § 82-1-111(2), MCA (1993); § 82-11-101(6), MCA (1983); and § 60-126, RCM (1947).

Four years after Hoge, United States Steel Corporation (now USX Corp.) again found itself embroiled in a case to determine the ownership of coal seam methane gas. In Rayburn v. USX Corp. (N.D. Ala. 1987), No. CIV.A.85-G-2661-W, 1987 U.S. Dist. LEXIS 6920, aff'd 844 F.2d 796, (11th Cir. 1988), a 1960 warranty deed granted to USX Corp. "the minerals and mining rights, except oil and gas and the right to explore for and remove the same. . . ." The grantors also covenanted that all coal seams "shall be encased or

9

grouted off" during the exploration for or production of oil and gas unless specifically exempted by USX Corp. in writing.

The court in Rayburn looked to the language of the deed regarding encasing and grouting off the coal seam as well as the intention of the parties and did not determine whether coal seam methane gas is part of the coal. The court determined that "[t]he clearly expressed intention is that the methane in the coal bed not be available to any well drilled by the grantors who reserved the 'oil and gas' or to their assigns." Rayburn, 1987 U.S. Dist. LEXIS 6920, at *8.

The court also determined that in 1960 when the warranty deed was granted, coal seam methane gas was not considered "commercially recoverable." Rayburn, 1987 U.S. Dist. LEXIS 6920, at *9. Once again, while the value of coal seam methane gas may not have been known in 1960, it was certainly considered a valuable resource by 1984 when Carbon County granted the coal and coal rights to Union Reserve. And, unlike the deed in Rayburn, there is no language in the deed to Union Reserve regarding "encasing and grouting off" the coal seam if wells were to be drilled.

There is also no language in the deed from Carbon County granting "other minerals" to Union Reserve as was the case in Vines v. McKenzie Methane Corp. (Ala. 1993), 619 So.2d 1305. In Vines, McKenzie Methane argued that it held a leasehold interest for the coalbed methane gas pursuant to a lease executed in 1902 between the landowners and the previous mineral owner, USX Corp. Through subsequent assignments, McKenzie held the leasehold interest in

10

"all of the coal, iron ore, and other minerals, in, under, and upon" Vine's property. Vines, 619 So.2d at 1306.

The Supreme Court of Alabama engaged in a plain meaning analysis and held that "the ownership of methane gas, with the accompanying rights to drill for this substance, was necessarily included in the mineral estates granted in the instruments." Vines, 619 So.2d at 1309.

Based on this grant of "other minerals," the Supreme Court of Alabama did not feel it necessary in Vines to address the issue of whether coal seam methane gas is part of the coal estate or part of the gas estate. However, the court was faced with addressing this very issue a few months later in NCNB Texas Nat. Bank, N.A. v. West (Ala. 1993), 631 So.2d 212.

In NCNB, two almost identical deeds from 1953 and 1954 granted to West's predecessors "all of the coal, and mining rights. . . ." The deeds reserved in favor of the Bank's predecessors everything that was not conveyed, including "all of the oil, gas, petroleum, and sulphur. . . ."

The Supreme Court of Alabama held that the coal owners have the "exclusive right" to produce and own coal seam methane gas from horizontal boreholes and vertical degasification wells drilled into the coal seam. NCNB, 631 So.2d at 229. Additionally, the court held that the gas estate has the right to recover coal seam methane gas from the gob area above the coal seam. NCNB, 631 So.2d at 229.

In reaching this conclusion, the Supreme Court of Alabama determined that the language of the deed was unambiguous and did

11

not require it to resort to arbitrary rules of construction to determine what the parties intended. NCNB, 631 So.2d at 222. The court stated:

> We can find no scientific or legal basis to support the proposition that coalbed methane gas should be treated as a resource separate and distinct from other natural gas, or from any other gas. The fact that the coalbed methane gas is produced by, and stored within, coal seams does not require the conclusion that a grant of "all coal" includes coalbed methane gas, nor does it require the conclusion that a reservation of "all gas" does not include coalbed methane gas.

NCNB, 631 So.2d at 222-23.

Although this statement would appear to favor the owner of the gas estate, the court concluded that since Alabama follows the nonownership theory of oil and gas, the coal seam methane gas belonged to the owner of the coal estate. The court explained that:

> The nonownership theory of gas ownership, because it recognizes the migratory nature of oil and gas, requires actual possession to establish ownership of the resource, and the right held by the landowner is "the right to reduce the oil and gas to possession or to sever this right for economic consideration."

NCNB, 631 So.2d at 223.

Unlike Alabama, Montana is an ownership-in-place state, and oil and gas, as long as they remain in the ground, are part of the realty. Stokes v. Tutvet (1958), 134 Mont. 250, 255, 328 P.2d 1096, 1099. Montana also recognizes the rule that the title to mineral interests in land, including oil and gas interests, may be segregated in whole or in part from the rest of the fee simple title. Stokes, 328 P.2d at 1099. This difference in theories of ownership of mineral interests distinguishes NCNB from the case

12

before us on appeal.

The most recent judicial determination of the ownership of coal seam methane gas actually requires us to look as far back as 1907, when President Theodore Roosevelt ordered the Department of Interior to withdraw from public entry and settlement, lands that contained "workable coal" and to suspend issuance of patents on the lands withdrawn. Southern Ute Indian Tribe v. AMOCO Production Co. (D.Colo. 1995), 874 F.Supp. 1142. In 1909 and 1910, Congress passed the Coal Lands Acts which reserved to the United States "all coal" contained in the withdrawn lands upon which entry had been made. In 1938, the federal government restored much of this land to the Southern Ute Indian Tribe along with the reservation of "all coal."

In Ute, the tribe claimed ownership of the coal seam methane gas on the Southern Ute Indian Reservation in southwestern Colorado based on the premise that the land restored to the tribe in 1938 containing the reservation of coal included a reservation of the coal seam methane gas. The United States District Court for the District of Colorado concluded that this reservation of coal by the United States in the Coal Lands Acts did not include a reservation of coal seam methane gas. Ute, 874 F. Supp. at 1151-52. Consequently, the court held that the tribe did not acquire title to the gas when the coal was restored to the tribe in 1938 because title to the gas had previously been conveyed to homesteaders under the Coal Lands Acts of 1909 and 1910. Ute, 874 F.Supp. at 1152.

In arriving at its decision, the court in Ute looked to the

13

plain meaning of the words "coal" and "gas" to determine the intent of Congress at the time the Acts were introduced. After examining various dictionary and statutory definitions of coal and gas, the court determined that "common sense dictates that in 1909 and 1910, Congress intended 'coal' to mean the solid rock substance." Ute, 874 F.Supp. at 1153-54. In addition, the court examined a 1981 decision of the Solicitor of the Interior Department of the United States wherein the Solicitor reached a similar conclusion. Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits (1981), 88 I.D. 538.

Although the Ute case dealt with federal statutes, a similar analysis can be applied to the case before us on appeal, in that the plain meaning of the language of the deed must be examined to determine the intent of the parties.

ISSUE 1

Is coal seam methane gas a constituent part of the coal estate?

The District Court concluded, as a matter of law, that "[c]oal seam methane is part of the coal and of the coal estate. . . ." Our standard of review relating to conclusions of law is whether the trial judge's interpretation of the law is correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

Union Reserve argues that the owner of the coal estate is also the owner of the coal seam methane gas because the gas is an incident to the formation of coal and reposes within the coal

14

structure. Florentine contends that since coal seam methane gas is not a chemical part of coal, it is potentially severable from the coal estate.

An examination of definitions from various sources reveals that coal and gas are mutually exclusive terms. The American Heritage Dictionary 285 (2d C. ed. 1985), defines coal as:

> [a] natural dark-brown to black solid used as a fuel, formed from fossilized plants and consisting of amorphous carbon with various organic and some inorganic compounds. [Emphasis added.]

Gas is defined as:

> [t]he state of matter distinguished from the solid and liquid states by very low density and viscosity, relatively great expansion and contraction with changes in pressure and temperature, the ability to diffuse readily, and the spontaneous tendency to become distributed uniformly throughout any container. [Emphasis added.]

American Heritage Dictionary 549 (2d C. ed. 1985). As these definitions illustrate, coal is a "solid" and gas is "distinguished from the solid."

A statutory definition of coal existing at the time the coal and coal rights were conveyed to Union Reserve can be found at § 82-4-203(17), MCA (1983). This section provides:

> "Minable coal" means that coal which can be removed through strip- or underground-mining methods adaptable to the location that coal is being mined or is planned to be mined.

Since coal seam methane gas is not mined through "strip- or underground-mining methods", it cannot be considered part of the coal that was conveyed to Union Reserve under this statutory definition.

In addition to the statute defining "minable coal," a statutory definition of gas existed at the time of the deed. "'Gas' means all natural gases and all other fluid hydrocarbons as produced at the wellhead and not defined as oil . . . ." Section 82-11-101(6), MCA (1983) (emphasis added). Since coal seam methane gas is a fluid hydrocarbon and is produced at the wellhead, it falls within this statutory definition of gas and again it is distinguishable from coal, a solid hydrocarbon.

The Montana Department of State Lands has had regulatory definitions of coal and gas since 1980. In the regulations, coal is defined as:

> [a] black or brownish-black solid fossil fuel which has been subjected to the natural process of coalification and which falls within the classification of coal by rank: I, anthracite; II, bituminous; III, sub-bituminous; IV, lignite.

26.3.302(1)(g), ARM (emphasis added). Gas is defined in these regulations, along with oil, as:

> all hydrocarbons and other substances and elements which are present in the earth in a gaseous or liquid form and produced therefrom. It shall not include coal, lignite, oil shale or similar solid hydrocarbons.

26.3.202(7), ARM (emphasis added).

In addition, the Montana Department of Natural Resources and Conservation defines gas as "all natural gases and all other fluid hydrocarbons as produced at the wellhead and not defined as oil . . . ." 36.22.302(31), ARM (emphasis added). As these regulatory definitions illustrate, gas is a fluid or gaseous hydrocarbon and does not include coal.

Furthermore, the Solicitor of the Department of the Interior

16

has concluded in two separate opinions that coal seam methane gas is distinct from coal and is therefore potentially severable from the coal estate. Rights to Coalbed Methane Under an Oil & Gas Lease for Lands in the Jicarilla Apache Reservation (1990), 98 I.D. 59; and Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits (1981), 88 I.D. 538.

Accordingly, we conclude that coal seam methane gas is not a constituent part of coal and, thus, it may be severed from the coal estate.

## ISSUE 2

Did the District Court err in determining that Union Reserve has the right to produce coal seam methane gas from the coal lands?

The District Court concluded that coal seam methane gas was included in the conveyance of "coal and coal rights" from Carbon County to Red Lodge Bear-Creek Partnership, Union Reserve's predecessor in interest. In addition, the court concluded that Florentine did not acquire a right to drill and produce the coal seam methane gas when it entered into the oil and gas lease. Again, our standard of review relating to conclusions of law is whether the trial judge's interpretation of the law is correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

Florentine argues that the District Court erred in not considering the plain meaning of the words in the deed to Union Reserve and that, applying the plain meaning rule, Union Reserve's ownership of "coal and coal rights" includes only coal and does not

17

include coal seam methane gas. Additionally, Florentine contends that the absence of any royalty on oil, gas or any mineral other than coal strongly implies the exclusion from the grant of any other mineral including gas which may be produced or saved from the coal formation.

Union Reserve argues that the term "coal rights" includes the rights to coal seam methane gas and that one of the incidents of the ownership of coal is the necessity, not merely the right, to vent coal seam methane gas in the course of coal mining activities for safety reasons. In addition, Union Reserve contends that it is important for the coal mine operator to have sufficient control over the drilling of wells into the coal to minimize the disruption to the mining process caused by the well.

In reaching its conclusions, the District Court focused on the physical properties of coal and gas without dealing with the language of the grant, the intent of the parties, or title and severance questions. "The words of a contract are to be understood in their ordinary and popular sense . . . ." Section 28-3-501, MCA; Moore v. Swanson (1976), 171 Mont. 160, 165, 556 P.2d 1249, 1252. We have already determined that, in their ordinary and popular sense, coal is a solid and gas is a fluid or gaseous substance. Hence, gas, including coal seam methane gas, is separate from coal and is not a constituent part of the coal estate.

When construing a phrase within a contract, the court must determine the intent of the parties from the writing alone if

18

possible. Section 28-3-303, MCA; Glacier Campground v. Wild Rivers, Inc. (1978), 182 Mont. 389, 394-95, 597 P.2d 689, 692. See also § 70-20-202, MCA; New Home Sewing Mach. Co. v. Songer (1931), 91 Mont. 127, 132, 7 P.2d 238, 239-40. The plain language of the deed says "coal and coal rights." The grant does not mention gas of any kind.

In addition, § 28-3-202, MCA, provides:

**Effect to be given to every part of contract.** The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other.

When looking to other parts of the deed as prescribed by § 28-3-202, MCA, we see that the deed provided only for a per ton royalty on coal but did not provide for a royalty on the coal seam methane gas. It is not a reasonable assumption that Carbon County would have conveyed its rights to the coal seam methane gas, a valuable resource, without some sort of compensation. Moreover, the rules of statutory construction prohibit such an interpretation.

**Contract restricted to its apparent objects.** However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.

Section 28-3-305, MCA.

Contrary to the testimony of Donald Blackburn and Norbert Kmoch that Union Reserve received the entire mineral estate that Carbon County acquired through the tax deed, including silver and gold, Union Reserve only acquired the coal and the incidental right to mine and remove the coal. No other hydrocarbon or mineral resource was conveyed under the narrow language used by the parties

19

in the deed.

Montana is an ownership-in-place state with regard to oil, gas and other minerals.

> Both petroleum and gas, as long as they remain in the ground, are a part of the realty. They belong to the owner of the land, and are a part of it as long as they are on it or in it, or subject to his control.

Stokes v. Tutvet (1958), 134 Mont. 250, 255, 328 P.2d 1096, 1099. In addition, title to the mineral interest in land may be segregated in whole or in part from the rest of the fee simple title. Stokes, 328 P.2d at 1099. Under the language of its grant, Carbon County, as owner of the land, conveyed the coal to Union Reserve, but retained ownership of all other mineral interests including coal seam methane gas.

Union Reserve argues that the owner of the coal estate needs to protect its miners and to do so, it must control the gas estate. Union Reserve's executives testified that they feared that extraction of coal seam methane gas enhanced by stimulation, i.e., hydrofracturing, in advance of mining will damage the roof of the coal seam, rendering entire tracts of coal unminable due to safety concerns. However, testimony presented by experts at trial showed that coal seam methane gas extraction does not harm the marketability or the minability of coal. Rajen Puri, an expert in coal seam methane gas recovery projects, testified that it is beneficial to the coal estate to rid the mine of dangerous coal seam methane gas prior to mining the coal. Additionally, Philip Malone, president of GeoMet, a geologic consulting firm, testified that hydrofracturing does not affect the safety of the mine and

20

that, if degasification is done in advance of mining, it makes the mine safer.

It has long been the law of Montana that the grant of a particular interest in property tacitly carries with the grant those incidents without which the grant would be of no avail. See § 70-1-520, MCA; Yellowstone Valley Co. v. Associated Mortg. Investors (1930), 88 Mont. 73, 80-81, 290 P. 255, 257. Similarly, the transfer of a mineral interest includes, by implication, the incidental rights reasonably necessary to extract the mineral. See Hurley v. Northern Pacific Railway Company (1969), 153 Mont. 199, 202, 455 P.2d 321, 323. While we recognize the need and right of the coal owner to extract and capture coal seam methane gas for safety purposes during the mining process as such an incidental mining right, the existence of that right does not, without a specific grant, also encompass either actual title to the gas estate or the right to produce it for commercial purposes.

Moreover, the evidence at trial clearly demonstrated that the owner of the gas estate can also safely extract and produce coal seam methane gas either in advance of or during coal mining operations.

Accordingly, we hold that as the lessee of Carbon County, the owner of the gas estate, Florentine has the right to drill for and to produce the coal seam methane gas at issue here. We also hold that Union Reserve has a mutual, simultaneous right to extract and to capture such gas for safety purposes, incident to its actual coal mining operations.

21

We leave to the agreement of the parties or to some future case the issue of whether, and if so, to what extent, the gas estate owner or lessee is entitled to be compensated by the coal owner for gas extracted and captured incident to the coal owner's mining operations.

ISSUE 3

Do the 1993 legislative amendments to § 15-1-101, MCA, and § 82-11-101, MCA, and the enactment of § 82-1-111, MCA, constitute an unlawful taking of coal seam methane gas from the owners of coal or coal lands?

Prior to 1993, there was no specific reference in the Montana statutes to coal seam methane gas, however, "gas" was defined at § 82-11-101(9), MCA (1991), as "all natural gases and all other fluid hydrocarbons as produced at the wellhead and not defined as oil. . . ."

In 1993, the Montana Legislature deleted the definition of gas from § 82-11-101, MCA, and added a new section that defines coal, gas and oil. Section 82-1-111, MCA, provides:

> (1) "Coal" means a combustible carbonaceaous rock formed from the compaction and induration of variously altered plant remains. Coal does not include:
> (a) methane gas or any other natural gas that may be found in any coal formation;
> (b) oil shale; or
> (c) gilsonite.
> (2) "Gas" means all natural gases and all other fluid hydrocarbons, including methane gas or any other natural gas found in any coal formation, as produced at the wellhead and not defined as oil in subsection (3).
> (3) "Oil" means crude petroleum oil and other hydrocarbons, regardless of gravity, that are produced at the wellhead in liquid form by ordinary production methods and that are not the result of condensation of gas before or after it leaves the reservoir.

22

In addition, the legislature inserted a new section into the Montana Code to insure that all instruments regarding coal, oil and gas are interpreted according to § 82-1-111, MCA. Section 1-4-110, MCA, provides:

> When used in any instrument, unless the clear and express terms of the instrument provide otherwise, the terms "coal", "gas", and "oil" must be construed as defined in 82-1-111.

The legislature also inserted definitions of gas and natural gas into § 15-1-101, MCA. Section 15-1-101(g), MCA, now provides:

> [t]he terms "gas" and "natural gas" are synonymous and mean gas as defined in 82-1-111(2). The terms include all natural gases and all other fluid hydrocarbons, including methane gas or any other natural gas found in any coal formation.

Union Reserve argues that these legislative amendments were simply regulatory and did not affect Union Reserve's ownership of the gas. In the alternative, Union Reserve argues that if these amendments serve to remove ownership from Union Reserve without compensation, then there is an unconstitutional taking.

Florentine contends that these legislative amendments merely clarified the existing law. In addition, Florentine argues that contrary to Union Reserve's claim that removal of coal seam methane gas destroys or eliminates the rights enjoyed by the coal estate owner, the extraction of coal seam methane gas actually enhances the value of the coal estate by eliminating a safety hazard.

These amendments to Title 82 of the Montana Code do not take away any rights a coal owner may have to coal seam methane gas. Senate Bill 294 was prospective in nature. It provided that the

23

"rights and duties that matured, penalties that were incurred, or proceedings that were begun before [the effective date of this act]" are not affected. In the case before us on appeal, we have held that there was a severance of the gas estate from the coal estate, hence, the owner of the coal estate did not have a right to the coal seam methane gas under the plain language of the grant and the question of taking without compensation is necessarily moot.

ISSUE 4

Did the District Court err in not granting punitive damages to Union Reserve?

Because we reverse and remand this case on the central issue of ownership of the coal seam methane gas, the issue of punitive damages is necessarily moot.

Reversed and remanded for further proceedings consistent with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices