No. 96-641

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

LAURICE ST. JOHN,

        Plaintiff and Appellant,

  v.

MISSOULA ELECTRIC COOPERATIVE, INC.,

        Defendant and Respondent.

APPEAL FROM:   District Court of the Fourth Judicial District,
                In and for the County of Missoula,
                The Honorable Edward McLean, Judge Presiding.

COUNSEL OF RECORD:

        For Appellant:

                Timothy D. Geiszler; Geiszler & Newcomer, Missoula, Montana

        For Respondent:

                Edward A. Murphy; Datsopoulos, MacDonald & Lind, Missoula,
                Montana

Submitted on Briefs: January 30, 1997

Decided: April 24, 1997

**FILED**

APR 24 1997

Filed: *Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

Laurice St. John (St. John), appeals from the Fourth Judicial District Court's Judgment awarding Missoula Electric Cooperative, Inc. (MEC), $1,160.30 on its counterclaim. We reverse and remand.

We address the following dispositive issue on appeal:

Did the District Court err in holding that the Payment Agreement entered into between St. John and MEC was a settlement of all disputes?

## BACKGROUND

In March of 1992, St. John purchased a house from Howard Lemm (Lemm) in Lolo, Montana. St. John did not move into the house for one year after her purchase. During that period she rented the property back to Lemm. St. John's house is equipped with two electrical meters, one serving the house (house meter), and the other serving the swimming pool (pool meter). The pool meter and the house meter were billed separately and given separate account numbers by MEC. The dispute in this case arises from a bill for electrical services to the pool meter.

In May of 1993, Lemm contacted St. John to see if she wanted to use the pool during the upcoming summer season. In response, St. John contacted a local pool service company to prepare the pool for use during the summer season. In August of 1993, St. John contacted MEC to open an account for power to her new house in preparation for her arrival at the residence later that month. Soon after St. John opened the account, MEC billed her $2,040

for electrical service credited to the pool meter.

In October of 1993, St. John contacted MEC regarding the large bill and contended that it was a mistake. MEC told St. John that the bill was likely an error and would be corrected later. However, St. John continued to be billed $2,040 for electrical service supplied to the pool for the period of July 20, 1993, through August 19, 1993. In addition to these charges, St. John received a later bill for an additional $2,040 for electrical services to the pool for the period of October 19, 1993, through November 10, 1993. This made her total bill $4,080. Although she refused to pay the bill from the pool meter, St. John continued to promptly pay all bills related to the house meter.

Due to St. John's refusal to pay the bill related to the pool meter, MEC terminated electrical services to both the house and the pool. Although it would have been possible for St. John to switch to another supplier for her electrical service, she would first have to obtain the consent of MEC. St. John had a friend restore power to her home without the permission or knowledge of MEC. When MEC discovered the unauthorized service, it again terminated all electrical service to St. John's two accounts.[1]

MEC agreed to reconnect St. John's service provided she enter into a written agreement to pay the disputed balance in monthly installments. The agreement provided as follows:

---

[1]. We note that termination of electrical service can be a matter of grave concern. The media reports that Imelda Marcos' unpaid electric bill of $200,000 may cause a power shutoff at her husband's air-cooled crypt. *Winners & Losers,* TIME, Feb. 10, 1997, at 19.

I Laurice St. John Agree to pay $882.18 at the time of reconnect. And agree to make payments of 250.00 a month until my balance is paid in full.

| | | |
|---|---|---|
| Previous Balance | 3908.87 | |
| current charges | 237.43 | |
| tampering fee/disc | 75.00 | |
| deposit | 264.00 | |
| reconnect fee | 75.00 | |
| | | |
| Total bal | 4,560.30 | |
| 8/29/94 pmt | -900.00 | |
| Remaining balance | 3,660.30 | to make monthly payment of $250.00 |

I understand that if this agreement is not kept current my account or accounts will be disconnected.

Members signature
/s/ Laurice A. St. John 8-29-94

Credit & Collections
/s/ Kelly M. Sherick

Under the terms of the above document, the repayment totaled $4,560.30. St. John agreed to make a $900 down payment and pay $250 per month until the remaining balance was paid. After St. John signed the agreement, and without St. John's knowledge or consent, MEC altered the document by adding the words "ACCORD AND SATISFACTION." In order to continue to receive electrical service, St. John made the down payment and ten monthly installments before she discontinued payments leaving a balance of $1,160.30 charged to the pool meter.

Unable to resolve her dispute with MEC, St. John filed suit against MEC alleging

negligent billing and negligent infliction of emotional distress. MEC asserted a counterclaim against St. John, seeking payment of the balance of $1,160. A trial was held before the court sitting without a jury.

In its Findings of Fact, the District Court found that St. John had agreed to make payments solely to restore the electrical service to her house. Nonetheless, the court concluded that St. John had agreed to "settle" the dispute and had only partially complied with the settlement agreement. Accordingly, the court entered judgment against St. John in the amount of $1,160. St. John appeals from this judgment.

## DISCUSSION

Did the District Court err in holding that the Payment Agreement entered into between St. John and MEC was a settlement of all disputes?

The standard of review of a district court's findings of fact is whether they are clearly erroneous. Daines v. Knight (1995), 269 Mont. 320, 324, 888 P.2d 904, 906. This Court has adopted a three-part test in determining whether the findings are clearly erroneous. Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. This test includes:

> First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. [Citations omitted.] Third, if substantial evidence exists and the effect of the evidence has not been misapprehended the Court may still find that "[A] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm

5

conviction that a mistake has been committed." . . .

DeSaye, 820 P.2d at 1287 (citing United States v. United States Gypsum Co. (1948), 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746). The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686; see also Kreger v. Francis (1995), 271 Mont. 444, 898 P.2d 672.

The court's ruling in favor of MEC is based upon the premise that "[i]f the parties to a legal dispute enter into an agreement to settle that dispute, the new agreement becomes enforceable according to its terms." The court concluded that "Laurice St. John and MEC entered into a new agreement to settle their dispute on August 29, 1994 and she partially performed her obligations under that agreement, but then breached it by failing to pay the entire amount owed to MEC." We hold that the court's conclusion that St. John entered into an agreement to "settle" the dispute is not correct in light of the court's findings of fact.

A number of the court's findings of fact relate specifically to the question of whether St. John had a valid dispute with MEC and whether she entered into an agreement to settle that dispute. The court found specifically that "St. John did not consume 40,000 kwh of electricity [$2,040.00] during the period from when her account was opened [August 12, 1993] to the August meter reading [August 19, 1993]." The court also found that, although MEC billed St. John for 40,000 kwh consumption from October 19, 1993 through November 15, 1993, "[t]he pool had been closed and shut down prior to October 19, 1993." These

findings would certainly indicate that St. John's challenge to the MEC billing was not without a basis.

Further, with regard to the substance of the "Agreement" that St. John signed in order to restore power to her residence, the court found that "St. John signed a written promise to pay this disputed balance in monthly installments, without admitting she was responsible for those disputed charges, and *without agreeing that the payment plan constituted a settlement of the dispute over the pool meter billing*." (Emphasis added.) The court also found that St. John had paid $3,400 to MEC "solely to keep her electrical service to her house." MEC has not cross-appealed from these findings of fact and thus they constitute established facts.

In light of these established facts, it is clear that St. John had a basis for disputing the MEC billing and that, in agreeing to make payments on the outstanding balance in order to restore power to her residence, she did not agree to "settle" the dispute. The court's conclusion that St. John and MEC entered into a new agreement to "settle" their dispute is contrary to the court's own Findings of Fact and is in error.

We hold that the court's judgment in favor of MEC is based upon an erroneous conclusion that St. John entered into an accord or agreement to settle her dispute with MEC. As the record and the court's own findings of fact indicate, there was no such settlement agreement.

Furthermore, once the court found that the dispute had been resolved through a settlement, it did not address the merits of St. John's claims for negligent billing and

negligent infliction of emotional distress. MEC contends that St. John failed to present a prima facie case of negligent infliction of emotional distress. However, it is for the trial court to determine whether the evidence supports a finding of severe emotional distress. Sacco v. High Country Independent Press (1995), 271 Mont. 209, 239, 896 P.2d 411, 429. In the absence of any findings and conclusions with regard to St. John's claims, we have no basis for determining whether those claims were of merit. Bauer v. Cook (1972), 182 Mont. 221, 228, 596 P.2d 200, 204. Accordingly, we reverse the judgment for MEC and remand for the District Court to address the merits of St. John's dispute with MEC's $4,080 bill and the merits of her claim against MEC for negligent infliction of emotional distress.

_W. William Leaphart_
Justice

We concur:

_____

_____

_____
Justices

8

Justice Terry N. Trieweiler specially concurring.

I concur with the majority's conclusion that the payment agreement between St. John and MEC did not settle their dispute regarding the amount owed by St. John for electrical service. I disagree, however, that that resolves all of the issues which must necessarily be decided on appeal in order to adequately guide the District Court after this case is remanded.

In addition to its conclusion that St. John had settled her dispute with MEC, the District Court also concluded that she failed to show that her meter malfunctioned or was misread. This conclusion was also inconsistent with the District Court's findings and should be specifically reversed by this Court.

The District Court found that seven days after St. John signed up for electrical service from MEC, she was billed $2040 for 40,000 kwh of service during that time, but that "St. John did not consume 40,000 kwh of electricity ($2040.00) during the period from when her account was opened (August 12, 1993) to the August meter reading (August 19, 1993)."

The District Court went on to find that St. John was later billed $2040 for 40,000 kwh of consumption from October 19, 1993, through November 15, 1993, but that the pool, for which the electricity had allegedly been consumed, had been shut down prior to October 19, 1993. Therefore, neither could that charge have been correct. In light of these findings, the District Court's conclusion that plaintiff failed to show her meter malfunctioned or was misread is incorrect. That conclusion should be reversed and upon reconsideration of this

case following remand, the District Court should be directed that judgment cannot be based on that erroneous conclusion.

I would furthermore conclude that the manner in which St. John was treated by MEC in this case was unconscionable and that as a matter of law electrical providers who monopolize electrical service cannot extort payment of legitimately disputed sums from their customers by terminating electrical service until payment is agreed upon. To fully understand just how egregious MEC's conduct was, it is necessary to look no further than the court's findings of fact. The following findings have not been appealed by MEC.

When St. John bought her home in Lolo on March 31, 1992, electrical service was provided through and billed from two separate meters. One meter measured consumption in the household, and the other meter measured consumption by the garage and swimming pool. MEC treated the charges separately and billed them separately.

Because the person who occupied the house before St. John bought it continued to live in the house after she bought it, that occupant continued to be responsible for electrical service for a period of time after St. John's purchase. St. John first signed an agreement with MEC to pay for electrical service on August 12, 1993. Seven days later, she was billed $2040 for electrical service provided to the pool area during that seven-day period of time. The only devices using electricity through the pool meter, however, were the electric light bulbs in the garage and the electricity for the pool. Even MEC believed at that time that the

meter had to have been misread in order to generate such a substantial and unprecedented charge.

In November, when St. John was again billed $2040, even after the pool had been closed and shut down for the winter, she disputed the amount that she was being charged. She continued to be billed for the full amount through 1993, but was billed separately for her house and the electrical services provided to the pool. During this time, St. John continued to promptly pay all bills related to her house. In spite of that fact, on April 5, 1994, MEC transferred the $4154 balance attributable to the pool meter to her house meter account, and then demanded full payment within seven days and threatened to terminate electrical service if payment was not made. St. John did not make full payment, and the electrical service was disconnected.

When a friend restored unauthorized service to St. John's house in order to avoid the extreme difficulties caused by the loss of her electricity, MEC discovered the unauthorized service and sought criminal prosecution of her for unauthorized use of electrical service. It then again terminated electrical service to her home.

It was under these circumstances that MEC then came to St. John and agreed to restore the electrical service, which was essential to the habitability of her home, on the condition that she sign a written agreement to pay the disputed amounts billed from her pool meter. She signed the promise to make monthly installments, but did not admit she was

responsible for the disputed charges, and did not agree that the payment plan constituted a settlement of the dispute over the amount due for electricity provided to the pool area.

As if MEC's conduct was not sufficiently reprehensible by this point in time, it then altered the agreement that St. John had signed, without her knowledge or approval, and added "ACCORD AND SATISFACTION" to the document. Not being sufficiently embarrassed by that impropriety, it then raised the document St. John signed as an actual accord and satisfaction in defense to this action.

The electric cooperative's conduct in this case is nothing short of extortion, combined with deceit.

The predicament in which St. John found herself due to the bungling, overreaching, and manipulation by MEC was compounded by the fact that she could not switch to Montana Power Company for her service without MEC's approval, which apparently was never given.

Under similar circumstances, the Supreme Court of Utah held that a public utility has a higher obligation to render services to the public than does an ordinary business. While, concededly, MEC is not a public utility, its status is similar in this case because of the monopoly it had over electrical service to St. John. In *Josephson v. Mountain Bell* (Utah 1978), 576 P.2d 850, the public utility which provided telephone service to the plaintiff in that case terminated service to his home because he was delinquent in payment for his business phone. The Utah Court held, under the circumstances, that:

But it is our opinion that the defendant should not be permitted to use the pressure of imposing a penalty upon the home and the family by denying them a public service they are entitled to and paying for. . . .

In accordance with what has been said above, we cannot see it as other than a deprivation of the plaintiffs of their rights to cut off their home phone service because charges on the separate business phone were delinquent. We therefore agree with plaintiffs' contention that the disconnection of their home phone was wrongful.

*Josephson*, 576 P.2d at 852-53 (footnote omitted).

Based on the reasoning in *Josephson*, I would conclude, likewise, that an electric cooperative with a monopoly over service to its consumers cannot terminate one form of service which has been fully paid for in order to leverage payment for another service which is legitimately or otherwise disputed. Even though the service disputed in *Josephson* was to a business premises and the issue was whether service could be terminated to the plaintiff's residence, the two services involved in this case had been treated just as separately by MEC prior to St. John's dispute with the cooperative over service to the pool area.

Finally, I would conclude, as the court did in *Trigg v. Middle Tennessee Electric Membership Corp.* (Tenn. Ct. App. 1975), 533 S.W.2d 730, that a company supplying electricity to the public cannot terminate service to a customer for nonpayment when there is a bona fide dispute concerning the correctness of the bill. In that case, the Tennessee Court held that:

A company supplying electricity to the public has the right to cut off service to a customer for nonpayment of a just service bill and the company may adopt a rule to that effect. Annot., 112 A.L.R. 237 (1938). An exception to the general rule exists when the customer has a bona fide dispute concerning

13

the correctness of the bill. *Steele v. Clinton Electric Light & Power Co.*, 123 Conn. 180, 193 A. 613, 615 (1937); Annot. 112 A.L.R. 237, 241 (1938); *see* also 43 Am.Jur., Public Utilities and Services, Sec. 65; Annot., 28 A.L.R. 475 (1924). . . .

. . . A public utility should not be able to coerce a customer to pay a disputed claim.

*Trigg*, 533 S.W.2d at 733.

While, once again, the rule applied in *Trigg* is normally applied to public utilities, the defendant in that case was the Middle Tennessee Electric Membership Corp., subject to the Electric Cooperative Law of Tennessee, as codified in Tenn. Code Ann. §§ 65-25-101 through -229 (1993). Furthermore, because of the monopolistic nature of MEC's relationship with St. John, the rationale for the rule is the same in this case.

For these reasons, I concur with what has been said in the majority opinion; however, feel it is insufficient and would expand the opinion to include the conclusions set forth in this opinion.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing specially concurring opinion.

_____
Justice

14