No. 96-041

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

KENNETH G. CAMPBELL, individually, and
as a shareholder of Elton Campbell Ranches, Inc.,
for and on behalf of Elton Campbell Ranches, Inc.,
in a derivative shareholders' action,

        Plaintiff and Appellant,

  v.

ELTON CAMPBELL RANCHES, INC., a Montana
corporation, ELTON CAMPBELL, an individual,
MARJORIE CAMPBELL, an individual, and
GARY D. CAMPBELL, an individual,

        Defendants and Respondents.

FILED

AUG 18 1997

~~Ed Smith~~
CLERK OF SUPREME COURT
STATE OF MONTANA

---

APPEAL FROM:    District Court of the Eight Judicial District,
                In and for the County of Cascade,
                The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Kirk D. Evenson, Warren D. Wenz; Marra, Wenz,
                Johnson & Hopkins, Great Falls, Montana

        For Respondents:

                Floyd Corder; Corder & Allen, Great Falls, Montana
                (for Elton Campbell Ranches, Inc.)

                L. D. Nybo; Conklin, Nybo, LeVeque & Murphy, Great
                Falls, Montana (for Elton Campbell, Marjorie Campbell,
                and Gary D. Campbell)

---

Submitted on Briefs: November 14, 1996
Decided: August 18, 1997

Filed:

_____
             Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1995 Internal Operating Rules, the following decision shall not be cited as precedent and shall be published by its filing as a public document with the Clerk of the Supreme Court and by a report of its result to State Reporter Publishing Company and West Publishing Company.

Kenneth G. Campbell (Ken) appeals from the judgment entered by the Eighth Judicial District Court, Cascade County, on its findings of fact, conclusions of law and order in his individual and derivative action against the family-owned corporation and his parents and one of his brothers in their capacities as directors, officers and shareholders. We affirm.

We restate the dispositive issues on appeal as follows:

1. Did the District Court err in concluding that Ken had not met a statutory prerequisite to maintaining a derivative claim?

2. Did the District Court err with regard to Ken's "control group-squeeze out" claims?

Ken is the son of Elton and Marjorie Campbell. Defendants and respondents are Elton and Marjorie, their son--and Ken's older brother--Gary D. Campbell, and Elton Campbell Ranches, Inc. (the Corporation), a Montana corporation. Ronald Campbell, the oldest Campbell son, is not a party to this action.

Elton and Marjorie formed the Corporation in 1972, after acquiring various farms in Cascade County, Montana. They began gifting shares of the Corporation to their sons immediately after incorporating the farms. Ken was upset when he received the initial gift of shares, believing that he was entitled to a larger gift because he worked on the farm property.

2

Until at least 1983, Elton and Marjorie held a majority of the Corporation's shares. At the time of trial, Elton, Marjorie, Gary, Ronald and Ken each owned in excess of 15% of the shares. Elton and Marjorie have been members of the Corporation's board of directors at all times. Ronald and Gary also have been directors of the Corporation at various times; Ken has not. Similarly, Elton, Marjorie, Ronald, Gary and Gary's wife, Sandra, have been officers of the Corporation at various times; Ken has not. The value of the Corporation at the time of trial--not including amounts at issue in this case--was approximately $1.8 million.

In 1980, the Corporation leased a small amount of corporate land to City Transfer and Disposal (City Transfer), a partnership, for the establishment and maintenance of a landfill; the rent was $10 per month. Ken knew about the landfill in the early 1980s.

Gary operated and maintained the landfill for City Transfer under written agreements which compensated him for his services. Over time, it became clear that City Transfer lacked adequate capital to run the landfill operation.

By March of 1983, Bayside Waste Hauling and Transfer, Inc. (Bayside), a Washington corporation, was in the process of purchasing City Transfer. Bayside was interested in leasing the landfill site and entering into an agreement with Gary to operate it. The Corporation determined that it wanted no further responsibility with regard to leasing the property on which the landfill was located. As a result, the Corporation and Gary entered into a lease of the landfill property (the Lease) on March 17, 1983. The Lease was for a 15-year period, at the same $10 per month rent contained in the earlier lease with City Transfer, and contained a renewal provision for an additional 15-year period. Ken knew of

the Lease between the Corporation and Gary at or around the time it was entered into in 1983.

Gary subleased the landfill site to Bayside for a 15-year term at a rent of $5,000 per year. He simultaneously entered into an operating agreement with Bayside under which he was responsible for operating and maintaining the landfill operation in accordance with applicable laws and regulations, providing the necessary equipment and obtaining appropriate insurance for the operation.

Thereafter, Gary and his family expended labor and money, in the amount of approximately $200,000, for capital improvements, repairs and maintenance in developing and operating the landfill. By 1986, Gary could not afford to meet the increasing governmental requirements for operating landfills; he could obtain neither a loan to finance the operation nor insurance against liability or pollution claims. As a result, in early 1986, Gary sold the landfill operating equipment he had purchased, terminated his operating agreement with Bayside and entered into a new, 12-year sublease of the landfill site with Bayside and other entities. Gary no longer operated the landfill thereafter but, pursuant to the sublease, he received rent on a "per ton" basis for refuse deposited at the landfill. A subsequent sublease also contained a "per ton" rental payment to Gary. Gary's rental income from 1986 through the early 1990s ranged from $50,000 to $60,000 per year. Ken knew of Gary's "passive" income from the landfill subleases by 1986 or 1987.

In 1992, the City of Great Falls and Cascade County began using the landfill. Gary's 1992 rental income from the landfill sublease was $103,481. Also in 1992, Elton and Marjorie hired an attorney to prepare an estate plan for them. The proposed estate plan

4

included a tax-free split-off of corporate assets to Ken. Ken objected on the basis that the split-off did not include any value for the landfill or landfill revenues.

Ken initiated the present action in 1992 by filing a complaint against the Corporation, Elton, Marjorie and Gary. The essence of the complaint was a "control group-squeeze out" claim against Elton, Marjorie and Gary, requesting that the Lease be set aside and Ken be allowed to recoup the landfill revenues received by Gary through the allegedly fraudulent conspiracy of Elton, Marjorie and Gary to waste and divert corporate assets to Gary's sole benefit. The allegations centered primarily on the Lease and the passive revenues Gary obtained thereafter from subleasing the landfill site.

The parties filed--and the District Court ruled on--a variety of motions. Among other things, the court directed Ken to file an amended complaint setting forth his landfill- and Lease-related claims as derivative claims brought for the benefit of the Corporation and provided for the appointment of a panel pursuant to § 35-1-545, MCA, to determine whether maintenance of the derivative proceeding was in the Corporation's best interests.

Ken subsequently filed a 5-count amended complaint. The derivative claims brought for the Corporation's benefit alleged that the Lease with Gary and the passive rents Gary received from the subleases constituted wrongful diversion and waste of corporate assets; they sought rescission of the Lease and return to the Corporation of the landfill and the rents received by Gary. The "control group-squeeze out" counts brought by Ken, individually, alleged breaches of various duties by the "control group"--namely, Elton, Marjorie and Gary--resulting in damage to Ken as a minority shareholder. Via these claims, Ken sought judicial dissolution of the Corporation or, alternatively, a buy-out of his shares at full value.

5

Thereafter, the panel authorized by the District Court filed its report. It found that unresolved questions of law and fact relating to the derivative claims should be further considered by the District Court and, therefore, that continuing Ken's derivative claims regarding the landfill and the revenues therefrom "is in the best interest of [the Corporation]."

A pretrial order was filed in June of 1995. Ken contended that the landfill was an asset of the Corporation, that the individual defendants had violated their duties to the Corporation by permitting Gary to improperly seize and profit from a corporate opportunity and that the value of the Lease, as well as the revenues received by Gary as a result thereof, should be returned to the Corporation for purposes of valuing Ken's shares in a buy-out of those shares by the Corporation. The defendants contended, among other things, that Ken had not made the statutorily-required demand on the Corporation prior to commencing his derivative action; that Ken's landfill- and Lease-related claims were barred by the statute of limitations; and, in any event, that the Lease was entirely proper and in full effect.

Following a bench trial, the District Court entered its findings of fact, conclusions of law and order. Its findings and conclusions related primarily to Ken's derivative claims regarding the landfill and Lease, since the parties had agreed--and the court found--that the Corporation would purchase Ken's shares for fair value. The court determined that no demand had been made, that the claims were further barred by statutes of limitations and, in any event, that Ken had established no fraud or breach of duty regarding the landfill and Lease. Judgment was entered thereon and Ken appeals.

1. Did the District Court err in concluding that Ken had not met a statutory prerequisite for maintaining his derivative claims related to the landfill and Lease?

A derivative proceeding is a "civil suit in the right of a domestic corporation. . . ." Section 35-1-541(1), MCA. It may not be commenced until "a written demand has been made upon the corporation to take suitable action. . . ." Section 35-1-543(1), MCA. The demand requirement adopted by the 1991 legislature is a universal rule intended to eliminate problems created by previously recognized exceptions to the general rule requiring a demand. Steven C. Bahls, *Montana's New Business Corporation Act: Duties, Dissension, Derivative Actions and Dissolution,* 53 MONT. L. REV. 36 (1992).

Here, the District Court found that no demand had been made and, therefore, concluded that the statutory prerequisite for maintaining the landfill- and Lease-related derivative claims had not been met. Ken does not challenge the District Court's finding that no demand was made. Rather, he contends that the District Court erred as a matter of law. We review a trial court's conclusion of law to determine whether the interpretation of the law is correct. Carbon County v. Union Reserve Coal Co., Inc. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686 (citation omitted).

Ken's first contention is that the statutory demand requirement had somehow been "waived" during pretrial proceedings. Specifically, he claims that a motion for summary judgment or, in the alternative, motion concerning derivative claim filed by the Corporation amounted to a waiver of any right to further object to the lack of the statutorily-required demand. The record belies this contention.

In its order on the Corporation's motion, which authorized the panel and directed the filing of an amended complaint, the District Court expressly stated its intention "to preserve all of the rights, remedies and defenses of the parties for future determination. . . ." Given the existence of the statutory demand requirement, it is clear that the District Court intended to preserve the Corporation's right to assert the absence of the required written demand and Ken's resulting inability to maintain the derivative claims. In addition, Ken's amended complaint--which alleged that demand had been made--was filed after the District Court ruled on the Corporation's motion; thus, Ken's own pleading put the demand question at issue. Finally, in the pretrial order entered thereafter, the Corporation specifically contended that Ken had not made the statutorily-required demand. The pretrial order was not modified thereafter and, as a result, it controlled the subsequent course of the action. *See* Rule 16(e), M.R.Civ.P. The demand question clearly remained at issue to and through the time of trial.

Ken's limited argument on this issue focuses on what he perceives as the inconceivability that derivative claims on which all involved invested substantial resources could be decided on such a narrow basis so late in the proceedings. While it is clear that different actions and decisions by the parties and the District Court at various times in the proceedings might have moved Ken's landfill- and Lease-related claims to resolution much earlier, there was plenty of confusion to go around. Indeed, Ken's own pleadings fell far short of providing a clear framework for the action. In any event, it is undisputed that Ken did not make a written demand on the Corporation, as required by § 35-1-543(1), MCA, prior to commencing his derivative proceeding.

8

We hold that Ken has established no error in the District Court's conclusion that he failed to satisfy a statutory prerequisite to the maintenance of his derivative claims brought for the benefit of the Corporation. Absent the demand, the derivative claims were not properly before the District Court and, as a result, we need not address Ken's other arguments relating thereto.

2. Did the District Court err with regard to Ken's "control group-squeeze out" claims?

Ken advances a hodgepodge of contentions relating to asserted error in the District Court's resolution of his "control group-squeeze out" claims. Like his complaint and amended complaint, the contentions intermix theories applicable to derivative claims and "control group" claims. They also attempt to reintroduce the Lease-related derivative claims resolved above into the "control group" claims for purposes of asserting some unspecified type of relief to which Ken as a minority shareholder is allegedly entitled. We decline to revisit the landfill- or Lease-related claims disposed of by our conclusion on issue one above.

Moreover, Ken's "control group-squeeze out" claims based on alleged fraud and oppression by the "control group" sought judicial dissolution of the Corporation, a buy-out of Ken's shares at full value, a partial split-off of certain Corporation land and/or damages. While § 35-1-938(2)(b), MCA, authorizes judicial dissolution when those in control of a corporation have acted fraudulently or oppressively, § 35-1-939, MCA, vests broad discretion in the trial court to grant such relief other than dissolution--including a purchase at fair value of a shareholder's shares--as it considers appropriate.

Here, in advance of any findings by the trial court regarding fraud or oppression, the parties agreed that the Corporation would purchase Ken's shares at fair value. The District

9

Court made a corresponding finding and, as a result, did not address oppression further with regard to the "control group" claims; it ultimately entered judgment requiring the Corporation to purchase Ken's shares for fair value in the amount of $320,360.74, representing Ken's 17.45% ownership of shares in the Corporation valued at $1.8 million. Thus, Ken obtained one of the types of relief prayed for in his "control group" claims, and his agreement to the buy-out obviates the necessity of addressing his "control group" claims further.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

August 18, 1997

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Kirk D. Evenson
Warren D. Wenz
MARRA, WENZ, JOHNSON & HOPKINS
P.O. Box 1525
Great Falls, MT 59403-1525

Floyd Corder
Corder & Allen
P.O. Box 2886
Great Falls, MT 59403-2886

L.D. Nybo
Conklin, Nybo, LeVeque & Murphy
P.O. Box 2049
Great Falls, MT 59403-2049

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy